## LADNER *v.* UNITED STATES.

No. 2.   Argued November 19, 1957.—Affirmed by an equally divided
Court January 6, 1958.—Rehearing granted, judgment vacated
and case restored to the calendar for reargument May 26,
1958.—Reargued October 22, 1958.—Decided
December 15, 1958.

**170**

*Harold Rosenwald,* acting under appointment by the Court, 352 U. S. 959, reargued the cause and filed two briefs for petitioner.

*Leonard B. Sand* reargued the cause for the United States. On the brief were *Solicitor General Rankin, Warren Olney, III,* then Assistant Attorney General, *Beatrice Rosenberg* and *Julia P. Cooper.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The petitioner was convicted in the United States District Court for the Southern District of Mississippi of assaulting two federal officers with a deadly weapon in violation of former 18 U. S. C. § 254.[1] The court sentenced the petitioner to the maximum punishment of 10 years' imprisonment on each conviction of assault,

---

[1] That statute provides:

"Whoever shall forcibly resist, oppose, impede, intimidate, or interfere with any person . . . [if he is a federal officer designated in § 253] while engaged in the performance of his official duties, or shall assault him on account of the performance of his official duties, shall be . . . imprisoned not more than three years . . . ; and whoever, in the commission of any of the acts described in this section, shall use a deadly or dangerous weapon shall be . . . imprisoned not more than ten years . . . ." 18 U. S. C. (1940 ed.) § 254.

the sentences to run consecutively.[2]  Upon completion of the first 10-year sentence, the petitioner made a motion in the District Court, under 28 U. S. C. § 2255, to correct the second, and consecutive, sentence.  He supported his motion by allegations that the evidence at his trial showed that he fired a single discharge from a shotgun into the front seat of an automobile and that the pellets wounded the two federal officers, who were transporting an arrested prisoner.  He contended that in this circumstance he was guilty of but one "assault" within the meaning of former § 254 and accordingly was subject to only one punishment.  The District Court denied his motion and the Court of Appeals for the Fifth Circuit affirmed. 230 F. 2d 726.  Both courts held that the wounding of two federal officers by the single discharge of a shotgun would constitute a separate offense against each officer under the statute.  We granted certiorari, 352 U. S. 907, to consider the construction of § 254 in light of principles applied to construe the federal criminal statutes involved in *Bell* v. *United States,* 349 U. S. 81; *United States* v. *Universal C. I. T. Credit Corp.,* 344 U. S. 218; and *Prince* v. *United States,* 352 U. S. 322.  We affirmed the Court of Appeals by an equally divided Court, 355 U. S. 282, but vacated our judgment, and set the case for reargument, when a petition for rehearing was granted.  356 U. S. 969.  Reargument was had this Term.

---

[2] Ladner was convicted by a jury on three separate counts; one for conspiring to assault the officers, a second for assaulting one of the officers, and a third for assaulting the other officer.  He was sentenced for two years on the conspiracy count, which sentence was to run concurrently with a 10-year sentence for assaulting one of the officers.  A 10-year sentence imposed for the assault on the second officer was to run from and after the expiration of the first two sentences.  Thus Ladner was sentenced to a total jail term of 20 years.  The proceedings instituted by Ladner's co-conspirator, one Cameron, for post-conviction relief are reported in 84 F. Supp. 289.

It is suggested that the remedy under § 2255 is not available to the petitioner in the circumstances of this case. The record does not disclose that the Government raised this question in the District Court or in the Court of Appeals, and the Government does not tender it as a Question Presented for Decision in its brief in this Court. This Court has often reached the merits of a case involving questions of statutory construction similar to that presented in this case under former 18 U. S. C. § 254 in proceedings by way of collateral attack upon consecutive sentences. In *In re Snow,* 120 U. S. 274, the petitioner brought a habeas corpus proceeding after serving seven months of three consecutive six-month sentences. He claimed that the sentencing court had misinterpreted the applicable statute and that he had committed but a single offense punishable by a single six-month sentence. This Court held that "the objection may be taken on *habeas corpus,* when the sentence on more than one of the convictions is sought to be enforced." *Id.,* at 285. In *Bell* v. *United States, supra,* a case on all fours with the present case, the Court reached the question of statutory construction over objection in the Government's brief in opposition to the petition for certiorari that the question could not be raised on motion under § 2255. Other cases in which the Court reached and decided questions of statutory construction, although the questions were raised by collateral attack on consecutive sentences, include: *Tinder* v. *United States,* 345 U. S. 565 (§ 2255); *Gore* v. *United States,* 357 U. S. 386 (§ 2255); *Prince* v. *United States, supra* (Federal Rule of Criminal Procedure 35); *Ebeling* v. *Morgan,* 237 U. S. 625 (habeas corpus); *Morgan* v. *Devine,* 237 U. S. 632 (habeas corpus). The fact that the Court has so often reached the merits of the statutory construction issues in such proceedings suggests that the availability of a collateral remedy is not a jurisdictional question in the sense that, if not properly raised, this

Court should nevertheless determine it *sua sponte.* Moreover, there was only meagre argument of the question of the availability of the remedy in this case. The Government submitted only a short discussion of the question in the body of its brief and made only a passing reference to it toward the close of the oral argument. The question of the scope of collateral attack upon criminal sentences is an important and complex one, judging from the number of decisions discussing it in the District Courts and the Courts of Appeals. We think that we should have the benefit of a full argument before dealing with the question. We, therefore, proceed to construe former 18 U. S. C. § 254 without, however, intimating any view as to the availability of a collateral remedy in another case where that question is properly raised, and is adequately briefed and argued in this Court.

There is no constitutional issue presented. The question for decision is as to the construction to be given former § 254 in the circumstances alleged by the petitioner. Did Congress mean that the single discharge of a shotgun would constitute one assault, and thus only one offense, regardless of the number of officers affected, or did Congress define a separate offense for each federal officer affected by the doing of the act? The congressional meaning is plainly open to question on the face of the statute, which originated as § 2 of the Act of May 18, 1934. 48 Stat. 780. The Government does not seriously contend otherwise, but emphasizes that the legislative history shows that the statute was designed to protect federal officers from personal harm, or the threat of personal harm, in the performance of their duties, or on account of the performance of their duties. From this premise, the Government argues that there must be an offense for each officer who is put in immediate apprehension of personal injury, *i. e.*, assaulted, and that each officer thus defines the unit of prosecution. The position is summed up in

the Government's brief as follows: "The legislation was aimed at protecting federal officers, not only to promote the orderly functioning of the federal government (whose efficiency would diminish in proportion to the number of individual officers affected), but also to protect the individual officers, as 'wards' of the federal government, from personal harm. Both of these legislative objectives make the individual officers a separate unit of protection."

However, we are unable to read the legislative history as clearly illumining the statute with this meaning. The history is scant, consisting largely of an Attorney General's letter recommending the passage of the legislation,[3]

---

[3] The letter, of January 3, 1934, to Senator Ashurst, Chairman of the Senate Committee on the Judiciary, is as follows:

"MY DEAR SENATOR:

"I wish again to renew the recommendation of this Department that legislation be enacted making it a Federal offense forcibly to resist, impede, or interfere with, or to assault or kill, any official or employee of the United States while engaged in, or on account of, the performance of his official duties. Congress has already made ·it a Federal offense to assault, resist, etc., officers or employees of the Bureau of Animal Industry of the Department of Agriculture while engaged in or on account of the execution of their duties (sec. 62, C. C.; sec. 118, title 18, U. S. C.); to assault, resist, etc., officers and others of the Customs and Internal Revenue, while engaged in the execution of their duties (sec. 65, C. C.; sec. 121, title 18, U. S. C.); to assault, resist, beat, wound, etc., any officer of the United States, or other person duly authorized, while serving or attempting to serve the process of any court of the United States (sec. 140, C. C.; sec. 245, title 18, U. S. C.); and to assault, resist, etc., immigration officials or employees while engaged in the performance of their duties (sec. 16, Immigration Act of Feb. 5, 1917, c. 29, 39 Stat. 885; sec. 152, title 8, U. S. C.). Three of the statutes just cited impose an increased penalty when a deadly or dangerous weapon is used in resisting the officer or employee.

"The need for general legislation of the same character, for the protection of Federal officers and employees other than those specifically embraced in the statutes above cited, becomes increasingly apparent every day. The Federal Government should not be com-

and sheds no real light on what Congress intended to be the unit of prosecution. Although the letter mentions the need for legislation for the protection of federal officers, it also speaks of the need for legislation "to further the legitimate purposes of the Federal government." From what appears, an argument at least as plausible as the Government's may be made that the congressional

---

pelled to rely upon the courts of the States, however respectable and well disposed, for the protection of its investigative and law-enforcement personnel; and Congress has recognized this fact at least to the extent indicated by the special acts above cited. This Department has found need for similar legislation for the adequate protection of the special agents of its division of investigation, several of whom have been assaulted in the course of a year, while in the performance of their official duties.

"In these cases resort must usually be had to the local police court, which affords but little relief to us, under the circumstances, in our effort to further the legitimate purposes of the Federal Government. It would seem to be preferable, however, instead of further extending the piecemeal legislation now on the statute books, to enact a broad general statute to embrace all proper cases, both within and outside the scope of existing legislation. Other cases in point are assaults on letter carriers, to cover which the Post Office Department has for several years past sought legislation; and the serious wounding, a couple of years ago, of the warden of the Federal Penitentiary at Leavenworth by escaped convicts outside the Federal jurisdiction. In the latter case it was possible to punish the escaped convicts under Federal law for their escape; but they could not be punished under any Federal law for the shooting of the warden.

"I have the honor, therefore, to enclose herewith a copy of S. 3184, which was introduced at the request of this Department in the Seventy-second Congress and to urge its reintroduction in the present Congress; and to express the hope that it may receive the prompt and serious consideration of your committee.

"Respectfully,
"Homer Cummings,
"Attorney General."

See, for the legislative history, S. Rep. No. 535, 73d Cong., 2d Sess.; H. R. Rep. No. 1455, 73d Cong., 2d Sess.; 78 Cong. Rec. 8126–8127.

aim was to prevent hindrance to the execution of official duty, and thus to assure the carrying out of federal purposes and interests, and was not to protect federal officers except as incident to that aim. Support for this meaning may be found in the fact that § 254 makes it unlawful not only to assault federal officers engaged on official duty but also forcibly to resist, oppose, impede, intimidate or interfere with such officers. Clearly one may resist, oppose, or impede the officers or interfere with the performance of their duties without placing them in personal danger. Such a congressional aim would, of course, be served by considering the act of hindrance as the unit of prosecution without regard to the number of federal officers affected by the act. For example, the locking of the door of a building to prevent the entry of officers intending to arrest a person within would be an act of hindrance denounced by the statute. We cannot find clearly from the statute, even when read in the light of its legislative history, that the Congress intended that the person locking the door might commit as many crimes as there are officers denied entry. And if we cannot find this meaning in the supposed case, we cannot find that Congress intended that a single act of assault affecting two officers constitutes two offenses under the statute. The Government frankly conceded on the oral argument that assault can be treated no differently from the other outlawed activities,[4] and that if a single act of hindrance

---

[4] This concession by the Government seems necessary in view of the lack of any indication that assault was to be treated differently, and in light of 18 U. S. C. § 111, the present recodification of § 254, which lumps assault in with the rest of the offensive actions. The statute now provides that "Whoever forcibly assaults, resists, opposes, impedes, intimidates, or interferes with" any designated federal officer "while engaged in or on account of the performance of his official duties" is committing a crime. The Reviser's Note indicates that this change in wording was not intended to be a substantive one.

which has an impact on two officers is only one offense when the act is not an assault, an act of assault can be only one offense even though it has an impact on two officers.

Moreover, an interpretation that there are as many assaults committed as there are officers affected would produce incongruous results. Punishments totally disproportionate to the act of assault could be imposed because it will often be the case that the number of officers affected will have little bearing upon the seriousness of the criminal act. For an assault is ordinarily held to be committed merely by putting another in apprehension of harm whether or not the actor actually intends to inflict or is capable of inflicting that harm.[5] Thus under the meaning for which the Government contends, one who shoots and seriously wounds an officer would commit one offense punishable by 10 years' imprisonment, but if he points a gun at five officers, putting all of them in apprehension of harm, he would commit five offenses punishable by 50 years' imprisonment, even though he does not fire the gun and no officer actually suffers injury. It is difficult, without a clearer indication than the materials before us provide, to find that Congress intended this result.

It is therefore apparent that § 254 may as reasonably be read to mean that the single discharge of the shotgun would constitute an "assault" without regard to the number of federal officers affected, as it may be read to mean that as many "assaults" would be committed as there were officers affected. Neither the wording of the statute nor its legislative history points clearly to either meaning. In that circumstance the Court applies a policy of lenity and adopts the less harsh meaning. "[W]hen choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose

---

[5] See Burdick, Law of Crime (1946), § 342; Clark and Marshall, Law of Crimes (1958), § 10.16; Miller on Criminal Law (1934) § 99.

the harsher alternative, to require that Congress should have spoken in language that is clear and definite. We should not derive criminal outlawry from some ambiguous implication." *United States* v. *Universal C. I. T. Credit Corp.,* 344 U. S. 218, 221–222. And in *Bell* v. *United States,* 349 U. S. 81, 83, the Court expressed this policy as follows: "When Congress leaves to the Judiciary the task of imputing to Congress an undeclared will, the ambiguity should be resolved in favor of lenity." See also *Prince* v. *United States, supra; Gore* v. *United States,* 357 U. S. 386, 391. This policy of lenity means that the Court will not interpret a federal criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what Congress intended. If Congress desires to create multiple offenses from a single act affecting more than one federal officer, Congress can make that meaning clear. We thus hold that the single discharge of a shotgun alleged by the petitioner in this case would constitute only a single violation of § 254.

It follows that the petitioner is entitled to an opportunity to sustain his allegation that his conviction of two assaults rested upon evidence that the wounding of the two officers resulted from a single discharge of the gun.[6] The District Court did not hold a hearing on his motion because of its view that the single discharge admitted by him resulted in two assaults. But the Court of Appeals, in affirming on the same ground, correctly acknowledged that if this were an erroneous view of the law, "there is a necessity for the determination of such a factual ques-

---

[6] In view of the trial judge's recollection that "more than one shot was fired into the car in which the officers were riding . . ." we cannot say that it is impossible that petitioner was properly convicted of more than one offense, even under the principles which govern here.

tion [and] there must be a hearing [at which] the [petitioner] is entitled to be present." 230 F. 2d, at 728. See *United States* v. *Hayman,* 342 U. S. 205, 219–220; *Walker* v. *Johnston,* 312 U. S. 275. Because the proceedings at the petitioner's trial were not transcribed [7] it will be necessary at the hearing on the motion to reconstruct the trial record. We decide only the issue tendered by the parties and intimate no view as to whether the petitioner may be entitled to correction of the consecutive sentence under any different fact situation which the reconstructed trial record may disclose.

The judgment of the Court of Appeals is reversed and the case is remanded to the District Court for further proceedings consistent with this opinion.

*It is so ordered.*

Mr. Justice Clark, dissenting.

By what to me is a dubious route, permitting a collateral attack to be made on this old judgment under § 2255 [1] proceedings, the Court reaches the merits only to agree fully with Ladner's contentions. As I see it, this enlargement of jurisdiction under § 2255 will subject the trial court dockets to a rash of applications by prisoners and completely overturn the purpose of the Congress in adopting the § 2255 procedure in lieu of habeas corpus. Moreover, it appears that by adopting Ladner's view on the merits the Court clearly informs the criminal, if I might be permitted to borrow a phrase, that assaults on

---

[7] Although 58 Stat. 5, now 28 U. S. C. § 753, which provides for the recording of all proceedings in criminal cases, was enacted on January 20, 1944, Congress had not appropriated funds for the payment of court reporters at the time of the trial in June 1944. See *Ricard* v. *United States,* 148 F. 2d 895; *Vickers* v. *United States,* 157 F. 2d 285.

[1] 28 U. S. C. § 2255 (1952).

the lives of federal officers come just "as cheap by the dozen."

Nearly fourteen years ago, two federal officers were ambushed and seriously wounded by Ladner when he shot them point-blank with a shotgun as they sat in the front seat of a vehicle transporting some prisoners arrested in a raid on an illicit distillery. He was convicted of an assault on each of the officers. Ladner contends that he fired only a single charge from the shotgun and is, therefore, guilty of only one offense, regardless of the number of officers assaulted.

The principal issue, as I see the case, is the procedural one under § 2255, namely whether the Court should allow this collateral attack on Ladner's sentence. This important question, both argued and briefed by the Government, is, I think, wrongly decided by the Court. These proceedings are by motion under § 2255 to correct the consecutive sentences of ten years imposed on each of Counts 2 and 3 of the indictment. Count 2 charges an assault on Officer James Buford Reed, while Count 3 charges one on Officer W. W. Frost. The record is unclear, as the Court points out, as to how many discharges of the shotgun Ladner fired into the vehicle. Hence a determination of that issue must be made by the trial court on remand of the case.

Clearly this is an error that should have been raised by appeal. It did not undermine the jurisdiction of the original trial court, for under the allegations of the indictment these counts clearly state separate offenses. It raises no constitutional issue. The history of § 2255 clearly reveals that such an attack was not authorized. Reference to *United States* v. *Hayman,* 342 U. S. 205 (1952), gives us a complete picture. The Judicial Conference of the United States proposed § 2255 to remedy the "practical problems that had arisen in the administration of the fed-

eral courts' *habeas corpus* jurisdiction." The Conference in submitting the measure to the Congress noted that

> "The motion remedy broadly covers all situations where the sentence is 'open to collateral attack.' As a remedy, it is intended to be as broad as habeas corpus." *Hayman, supra,* at 217.

It is clear that in enacting § 2255, Congress did not intend to enlarge the available grounds for collateral attack, but rather sought only to correct serious administrative problems that had developed in the exercise over the years of habeas corpus jurisdiction.

The Court today holds that the trial court *may* have committed an error of law which will require the reconstruction of the evidence as to the number of shots fired by Ladner. As I have indicated, this may require a retrial of this fourteen-year-old case. Here the indictment and judgment are admittedly regular on their faces. The dispute is entirely with the facts of the incident. The issue, therefore, is squarely governed by the principles of *Sunal* v. *Large,* 332 U. S. 174 (1947). That was a habeas corpus proceeding attacking a conviction admittedly obtained as a result of error of the trial court. As here, neither the jurisdiction of the trial court nor claimed constitutional violations were at issue. The Court, speaking through MR. JUSTICE DOUGLAS, said:

> "Congress . . . has provided a regular, orderly method for correction of all such errors by granting an appeal to the Circuit Court of Appeals and by vesting us with certiorari jurisdiction. . . . Every error is potentially reversible error; and many rulings of the trial court spell the difference between conviction and acquittal. If defendants who accept the judgment of conviction and do not appeal can later renew their attack on the judgment by *habeas corpus,*

litigation in these criminal cases will be interminable. Wise judicial administration of the federal courts counsels against such course, at least where the error does not trench on any constitutional rights of defendants nor involve the jurisdiction of the trial court." 332 U. S., at 181–182.

The history and language of § 2255 show that the same limitations are present in such proceedings and that they are equally jurisdictional. What was enacted by Congress to solve the practical problems created by the "great increases" in habeas corpus applications today becomes the tool by which prisoners can pry open their convictions on even broader grounds than were ever permitted theretofore. It appears entirely probable that a much greater administrative problem will result than confronted the courts before the enactment of § 2255.

The Court cites seven cases in which we decided "questions of statutory construction" although the questions were raised by "collateral attack upon consecutive sentences . . . ." But those cases only point up my position the more, *i. e.*, that a collateral attack can be made only where the error in the sentence is apparent from the facts alleged in the four corners of the indictment or admitted by the parties. In five of the cases, *i. e., In re Snow,* 120 U. S. 274 (1887); *Tinder* v. *United States,* 345 U. S. 565 (1953); *Gore* v. *United States,* 357 U. S. 386 (1958); *Prince* v. *United States,* 352 U. S. 322 (1957), and *Ebeling* v. *Morgan,* 237 U. S. 625 (1915), the error in sentencing is apparent from the face of the indictment. In the remaining two cases, *Bell* v. *United States,* 349 U. S. 81 (1955),[2] and *Morgan* v. *Devine,* 237 U. S. 632 (1915), the facts were admitted. The importance of this

---

[2] Though the § 2255 issue was mentioned in the Government's reply to the petition for certiorari in *Bell,* the question was not briefed nor argued on the merits.

distinction is indicated by the Court in *Prince* where it goes out of its way to point out that it was admitted by respondent that the robbery charged in Count 1 was performed immediately after the entry into the bank, charged in Count 2. The majority cannot point to a single case in this Court where collateral attack on consecutive sentences has been permitted under § 2255 when the facts were in dispute. There is none. The law has long been settled, formerly under habeas corpus and now under § 2255, to the contrary.

However, even more surprising to me, as it runs counter to my understanding of efficient judicial administration, is the Court's statement that its holding today should not be considered as "intimating any view as to the availability of a collateral remedy in another case where that question is properly raised, and is adequately briefed and argued in this Court." I find no counterpart for such a handling in our precedents. Implicit therein is the suggestion that come another case where the point is "properly raised [and] adequately briefed and argued in this Court" [3] then the conclusion will be different. Meanwhile, the Court says, *Ladner* is no precedent on the question of "the availability of a collateral remedy." Despite this, the Court permits its use here. This *ad hoc* disposition is not in keeping with good business conduct so necessary in court administration.

I do not reach the merits. The Congress, however, may correct that error of the Court. But the *ad hoc* manner in which it has today disposed of the case we shall have with us always—a precedent for others to follow.

---

[3] The point was raised in this Court. The Government devoted four and one-half pages of its 29-page brief to it, discussing 18 separate cases. My research of the question indicates there would be little to add to the Government's discussion.