William DOBBS and Roger
Peele, Appellants,

v.

Clarence S. NEVERSON, Appellee.

Delbert C. JACKSON, Appellant,

v.

Clarence S. NEVERSON, Appellee.

Nos. 10984, 10985.

District of Columbia Court of Appeals.

Argued May 17, 1977.

Decided Oct. 10, 1978.

Robert Fabrikant, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty. and John A. Terry, Albert H. Turkus, and Oscar Altshuler, Asst. U. S. Attys., Washington, D. C., were on brief, for appellants in No. 10984.

S. Perry Jones, Asst. Corp. Counsel, Washington, D. C., with whom John R. Risher, Jr., Corp. Counsel, Washington, D. C., when the case was briefed and argued, Louis P. Robbins, Principal Deputy Corp. Counsel, and Richard W. Barton, Deputy Corp. Counsel, Washington, D. C., were on brief, for appellant in No. 10985.

Alan F. Greenwald, Public Defender Service, Washington, D. C., for appellee.

Before GALLAGHER, YEAGLEY and HARRIS, Associate Judges.

HARRIS, Associate Judge.

The trial court granted appellee's petition for a writ of habeas corpus which sought his release from St. Elizabeths Hospital; the government appeals.[1] We reverse.

## I

On March 16, 1973, appellee was convicted in the Superior Court of taking indecent liberties with a minor. D.C. Code 1973, § 22–2801. He was sentenced to 18 to 54 months' imprisonment. On March 19, 1973, he was sent to the Lorton Correctional Complex, a penal institution under the jurisdiction and control of the District of Columbia's Department of Corrections. While he was at Lorton, appellee was found to be mentally ill. He therefore was transferred to St. Elizabeths Hospital on December 19, 1975 (pursuant to D.C.Code 1973, § 24–302), by order of the Superior Court.

While thus incarcerated at St. Elizabeths and while still receiving treatment for his mental illness, appellee filed a petition for a writ of habeas corpus. He alleged that he was entitled to his release from custody because his "short-term release date," which takes into account "good time" (good conduct) credits, had passed.[2] The government then urged, as it does on this appeal, that because appellee still was confined at St. Elizabeths and still was admittedly mentally ill, his good time credits were to be held in abeyance and he should remain in custody until he recovered from his illness and was released from St. Elizabeths or until his maximum sentence expired. The government took the position that this result was mandated by 18 U.S.C. § 4241 (1970), the federal statute dealing with the transfer of mentally ill prisoners, which provides that when a federal prisoner is transferred to a mental hospital, he is to be kept there until he is "restored to sanity or health or until the maximum sentence, without deduction for good time or commutation of sentence, shall have been served."[3]

The trial court agreed with appellee that the federal statute was inapplicable. It

1. The appellants in No. 10984 are officials of the hospital; they are represented by the United States Attorney. The appellant in No. 10985 is the Director of the Department of Corrections of the District of Columbia; he is represented by the Corporation Counsel. We refer collectively to all three appellants as "the government."

2. A prisoner's short-term release date is determined by subtracting his presentence custody credit (in this case, 230 days) and the maximum potential good time credit (computed at the rate of seven days per month under 18 U.S.C. § 4161—thus, in this case, $7 \times 54 = 378$ days), from the maximum sentence (54 months). Under this computation, appellee's short-term release date was January 16, 1976.

3. For the text of 18 U.S.C. § 4241, see note 8, infra. Appellee's full term (or "long term") release date, which takes into account credit for time served prior to sentencing but does not include credit for good time, was January 28, 1977.

concluded that because the District of Columbia Code counterpart (§ 24–302) is silent on the subject of good time in relation to mentally ill transferees, appellee should have been released on his short-term release date of January 16, 1976. Accordingly, on April 1, 1976, the court ordered that appellee should be released from custody.[4]

This appeal imposes the task of construing and harmonizing the federal and District of Columbia statutes dealing with good time allowances and the transfer of mentally ill prisoners.

## II

■ Both the United States Code and the District of Columbia Code contain provisions for the allowance of good time credits for prisoners. The D.C.Code provision, originally enacted in 1901, applies to "[a]ll persons sentenced to and imprisoned in the jail or in the workhouse of the District of Columbia, and confined there for a term of one month or longer . . .." D.C. Code 1973, § 24–405. When Congress amended that statute in 1940 to provide for the computation of good time credits in a manner substantially similar to that of its federal counterpart, the reference to the institutions affected was left unchanged. Subsequently, in *Johnson v. Ward,* 107 U.S.App. D.C. 365, 278 F.2d 245 (1960), the United States Court of Appeals for the District of Columbia Circuit held that the restrictive language "jail or workhouse" limited the good time deductions of § 24–405 to prisoners so confined, as distinguished from those

imprisoned in a penitentiary such as the Lorton complex.[5] Thus, the circuit court applied the federal good time statute, 18 U.S.C. § 4161, to D.C. prisoners incarcerated at Lorton. *Id.,* at 366, 278 F.2d at 246. The latter statute provides in part:

> Each prisoner convicted of an offense against the United States and confined in a penal or correctional institution . . shall be entitled to a deduction [for good time] from the term of his sentence . . . .

The language "offense against the United States" was interpreted in *Johnson* to include offenses under the D.C.Code, at least for purposes of this statute.[6] *See also Story v. Rives,* 68 App.D.C. 325, 97 F.2d 182, *cert. denied,* 305 U.S. 595, 59 S.Ct. 71, 83 L.Ed. 377 (1938); *Gilstrap v. Clemmer,* 284 F.2d 804 (4th Cir. 1960); *cf. Arnstein v. United States,* 54 App.D.C. 199, 296 F. 946 (1924); *Fletcher v. United States,* 42 App. D.C. 53 (1914), *cert. denied,* 235 U.S. 706, 35 S.Ct. 283, 59 L.Ed. 434 (1915).

Under the District of Columbia Court Reform and Criminal Procedure Act of 1970, the decision by the circuit court in *Johnson v. Ward, supra,* not to extend the local good time statute to Lorton inmates is binding upon us in the absence of an en banc determination to modify or overrule it. *See M. A. P. v. Ryan,* D.C.App., 285 A.2d 310 (1971). Appellee invites us to take such action, that is, to end Lorton inmates' dependence on the federal statute for good time credits. Appellee contends that such a

---

4. The trial court stayed its own order for 30 days in order that civil commitment procedures might be initiated.

5. In its carefully reasoned Memorandum Opinion, the trial court theorized that the reason Congress used the language "jail or workhouse" in the D.C. statute was because at the time the law was originally enacted in 1901, there was no other District of Columbia penal institution in existence. It is difficult, however to speculate as to whether the fact that Congress did not change this language when it amended the statute in 1940 was intentional or a legislative oversight. We do know that the Lorton complex was in existence at the time of the statute's amendment in 1940. *See Story v. Rives,* 68 App.D.C. 325, 97 F.2d 182, *cert. de-*

*nied,* 305 U.S. 595, 59 S.Ct. 71, 83 L.Ed. 377 (1938).

6. Such reasoning, of course, was sound; all violations of the criminal provisions of the District of Columbia Code (contained in Title 22 thereof) are prosecuted in the name of the United States by the United States Attorney. Also, all persons who are sentenced to imprisonment for violations of the District of Columbia Code are, like those sentenced for violations of the United States Code, committed "to the custody of the Attorney General of the United States or his authorized representative, who shall designate the places of confinements where the sentences of all such persons shall be served." D.C.Code 1973, § 24–425.

determination would resolve the conflict at bar, since under such a ruling the federal transfer statute could not apply to a prisoner transferred from Lorton. However, the resolution of this case ultimately depends not on the source of appellee's good conduct credits, but on the proper interpretation of the D.C.Code provision regarding the transfer of prison inmates to mental hospitals. Furthermore, we hesitate to alter a policy which long has been followed by the Department of Corrections and which has been recognized and affirmed judicially. *See, e. g., Gilstrap v. Clemmer, supra,* at 805. It thus may be accepted that appellee properly was entitled to good time credits under the federal statute.

### III

■ The District of Columbia Code and the United States Code contain somewhat different provisions for the transfer to a mental hospital of a prisoner who is determined to be mentally ill while serving a sentence. The D.C. transfer statute is applicable to "[a]ny person . . . serving sentence of any court of the District of Columbia for crime, in a District of Columbia penal institution." D.C. Code 1973, § 24–302.[7] The federal statute, on the other hand, appears to apply only to prisoners confined in federal penal and correctional institutions. 18 U.S.C. § 4241 (1970).[8]

The federal transfer statute expressly provides that any person transferred to a mental hospital pursuant to its provisions is to remain there until he recovers from his illness, or until the expiration of his maximum sentence, "without deduction for good time . . . .." *Ibid.* The D.C. Code provision, however, is silent as to the effect of a prisoner's transfer on his good time allowances, providing only that such a prisoner shall "receive care and treatment during the continuance of his mental illness." D.C. Code 1973, § 24–302. The only other reference in the D.C. Code to the time of release from a mental hospital is found in § 24–303(b), which provides that a prisoner who has been transferred under § 24–302 may be returned to the Department of Corrections upon certification by the superintendent of the hospital that the prisoner has been "restored to mental health." This section, however, comes into play only when a prisoner recovers from his mental illness prior to the expiration of his sentence. Thus, while the federal statute does not permit a prisoner to receive the benefit of good time allowances while he is in a mental hospital, the local provision does not address this issue in specific terms.[9]

7. The full text of § 24–302 is as follows:
   Any person while serving sentence of any court of the District of Columbia for crime, in a District of Columbia penal institution, and who, in the opinion of the Director of the Department of Corrections of the District of Columbia, is mentally ill, shall be referred by such Director to the psychiatrist functioning under section 24–106, and if such psychiatrist certifies that the person is mentally ill, this shall be sufficient to authorize the Director to transfer such person to a hospital for the mentally ill to receive care and treatment during the continuance of his mental illness.

8. The full text of 18 U.S.C. § 4241 is as follows:
   **Examination and transfer to hospital**
   A board of examiners for each Federal penal and correctional institution shall consist of (1) a medical officer appointed by the warden or superintendent of the institution; (2) a medical officer appointed by the Attorney General; and (3) a competent expert in mental diseases appointed by the Surgeon General of the United States Public Health Service.

   Such board shall examine any inmate of the institution alleged to be insane or of unsound mind or otherwise defective and report their findings and the facts on which they are based to the Attorney General.

   The Attorney General, upon receiving such report, may direct the warden or superintendent or other official having custody of the prisoner to cause such prisoner to be removed to the United States hospital for defective delinquents or to any other institution authorized by law to receive insane persons charged with or convicted of offenses against the United States, there to be kept until, in the judgment of the superintendent of said hospital, the prisoner shall be restored to sanity or health or until the maximum sentence, without deduction for good time or commutation of sentence, shall have been served.

9. It should be noted that a transfer to a mental health facility under the federal statute does not forever deprive the prisoner of his good time. As the trial court noted, such an in-

The government contends that because appellee, like all D.C. prisoners confined at Lorton, receives his good conduct credits under the federal good time scheme, he is therefore subject to the limitations imposed by federal law on the operation of such credits notwithstanding the fact that he was transferred pursuant to local law. The trial court rejected this view, concluding that the federal transfer provisions are not integral parts of the federal good time scheme. The court cited several factors which support this position. First, the language in 18 U.S.C. § 4241 restricting good time does not appear in the good time portion of the United States Code. Rather, it appears in the "Mental Defectives" chapter in the section entitled "Examination and transfer to hospital." Second, when the circuit court stated in *Johnson v. Ward, supra,* that the federal good time scheme applies to District of Columbia prisoners in Lorton, the court specifically referred to §§ 4161–4166 of Title 18. The circuit court did not mention that § 4241 was a part of that overall plan, although that section had been in existence for 30 years at the time of the opinion. (As the trial court noted, however, *Johnson v. Ward* was not a hospital transfer case, and the omission therefore may be insignificant.) Finally, the trial court found that the context of the language "without deduction for good time" is such that Congress must have intended it to act as a potential extension of the transfer period, and not as a deduction of good time per se. The trial court found support for this view in the fact that § 4241 does not alter the computation of good time. A prisoner does not gain or forfeit good time as a result of his transfer to the hospital. He continues to "earn" good time at the rate prescribed in § 4161; the only restriction imposed by § 4241 is that the time awarded may not actually be subtracted from his long-term commitment time while the prisoner remains hospitalized. Thus, if appellee had recovered from his mental ill-

ness and had been transferred back to Lorton, he would have been entitled to his release as of his short-term release date (January 16, 1976). The only way a prisoner can actually "forfeit" good time is by violating prison rules. *See* 18 U.S.C. § 4165 (1970).

From this we conclude, as did the Superior Court, that § 4241 is not an integral component of the federal good time scheme, but rather that it constitutes a directive to hold the entire good time system in abeyance while another set of provisions, the federal transfer scheme, is being employed. This conclusion is further supported by the fact that even though appellee was awarded good time under the federal statute, he was moved to St. Elizabeths pursuant to the local transfer statute (§ 24–302) rather than under its federal counterpart. If the federal transfer scheme were a necessary component of the federal good time system, it would follow that all prisoners who are confined in Lorton for D.C. Code violations, and who are found to be mentally ill, should be transferred under the federal statute because they are awarded good time under the federal provision. This would be illogical. We also note that it is (and has been) the policy of both the Department of Corrections and the Superior Court to effectuate the transfer of Lorton prisoners pursuant to local rather than federal law, and we take this fact as some evidence that the two federal schemes are separable.

### IV

■ Having concluded that 18 U.S.C. § 4241 is not a necessary aspect of the federal good time scheme, we now examine the local transfer statute, § 24–302, to determine whether Congress intended to implement in it the same policy of withholding a transferee's good time credits during his hospitalization that is expressly provided for in the federal statute. As the trial court noted, in enacting § 4241 Congress

---

mate's good time is "held in abeyance" while he receives treatment, but if he recovers his sanity and is released from the hospital prior to the expiration of his sentence, all good time

allowances which otherwise would have been credited are restored upon the inmate's release from the hospital.

appeared to give priority to the continued treatment of the mentally ill prisoner over the provisions governing his mandatory short-term release. The rationale behind this policy is quite understandable—that is, both the prisoner and society are better off if the inmate remains hospitalized and receives treatment while he is mentally ill.

Section 24–302 provides only that the transferee is "to receive care and treatment during the continuance of his mental illness." As noted above, it contains no express language on the effect of a transfer upon the transferee's good time allowances. The trial court noted that Congress specifically had employed the language "without deduction for good time" in the federal statute as early as 1930. When Congress amended the local transfer provision in 1955, the trial court reasoned, it must have been aware of the language in the federal law and thus would have expressly included it in § 24–302 if it had intended the limitation to apply to local prisoners.[10] The trial court concluded that the fact that Congress did not include some restrictive language could hardly be ascribed to legislative oversight in light of this background, and therefore that no restrictions were intended for District of Columbia prisoners.

The government contends, however, that the trial court erred in construing Congress' silence as an affirmative legislative decision to accord transferees from District of Columbia penal institutions different treatment than that given federal transferees. The government points out initially that the D.C. Code provides that a transferee is to remain hospitalized "during the continuance of his mental illness," D.C. Code 1973,

§ 24–302, until he "shall be restored to mental health." Id., § 24–303(b). Unfortunately, the legislative history of these provisions gives no clue as to whether Congress intended the language to have any effect on a transferee's good time credits. However, as the trial court concluded and as appellee acknowledged, the probable intention of Congress when it originally enacted § 24–302 in 1901 was to keep a mentally ill prisoner hospitalized until he regained his sanity, even past the maximum term of his sentence if necessary.[11] When § 24–302 was amended in 1955, Congress left the transfer period open-ended—i. e., the transferee was to remain hospitalized "during the continuance of his mental illness." The government has advised us of the long-standing practice not to release transferees from hospitalization with good time deductions. Thus, it argues, if Congress' silence is—as the trial court concluded—pregnant with meaning, then it must be interpreted as an affirmation rather than a rejection of this established custom.

The government's argument has merit. The plain language of § 24–302 indicates an intent to keep a transferee hospitalized until he regains his mental health. All parties have conceded (and the trial court agreed) that this likely was what Congress originally intended. If that was indeed the legislature's intent in 1901, it would not be logical to conclude that Congress bespoke an intent to alter that scheme merely by retaining the original language in substantially the same form in the 1955 amendment, rather than changing the language specifically to conform to the federal statute which had

---

**10.** Prior to the amendment of § 24–302 in 1955, the section had read:

> Any person becoming insane while undergoing a sentence of any court of the District of Columbia for crime may, in like manner, be committed to said hospital for the insane, by order of the Secretary of Interior, to receive the same treatment as other patients during the continuance of his disorder.

The text of § 24–302 following the 1955 amendment is set forth in note 7, *supra.*

**11.** When Congress passed § 24–302 in 1901, and when that statute was amended in 1955, the Supreme Court had not yet decided *Bax-*

*strom v. Herold,* 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966). In *Baxstrom,* the Court held, with reference to one who had been sentenced to prison for a crime and subsequently had been found to be mentally ill, that it is unconstitutional to retain a prisoner in a mental hospital past the expiration of his maximum sentence, even if he has not regained his sanity. (That holding, however, does not present a bar to the initiation by the government of a civil commitment proceeding in an effort to preclude a transferee's premature return to society.)

been enacted in 1930. The trial court nevertheless concluded, in effect, that even though Congress' original intention was to keep a transferee hospitalized without deductions for good time until he regains his sanity, Congress must have changed its mind in 1955 since it left the original language substantially the same when it was aware of the specifically restrictive language in the federal code.

There are four factors which militate against the result reached by the trial court. First, as the court itself pointed out, § 24–302 (transfer) and § 24–405 (good time) originally were passed on the same day and were parts of the same Act. Therefore, Congress was aware of the good time provision when it elected to employ the language "during the continuance of his disorder" in § 24–302. This provides some indication that as early as 1901 Congress gave priority to the treatment of the mentally ill inmate over the operation of the good time allowance concept. Second, the legislative history of the 1955 amendment to § 24–302 demonstrates that at that time Congress' primary concern was not with the disposition of good conduct credits, but rather with achieving a more expedient transfer of mentally ill prisoners to the hospital. See H.R.Rep. No. 892, 84th Cong., 1st Sess. 4 (1955). It is probable that in amending § 24–302, Congress did not even consult the federal transfer statute (18 U.S.C. § 4241), because the procedures employed by the respective transfer statutes are different.[12] There is nothing to indicate that the local transfer provision was intended to be patterned after the federal one. Therefore, the fact that Congress did not include in the 1955 amendment any language specifically restricting good time (similar to the language contained in 18 U.S.C. § 4241) cannot be viewed as an affirmative indication that it intended local prisoners to be released on their short-term release dates while similarly situated federal prisoners were to remain hospitalized.

A third factor in the government's favor is that on the single occasion on which Congress explicitly dealt with the issue of good time allowances earned by prisoners who are transferred to mental hospitals (18 U.S.C. § 4241), it expressly declined to permit the effectuation of good time credits while the prisoner is still hospitalized. This restriction reflects a rational policy decision that a mentally ill prisoner is not fit to be returned to society and should be retained for treatment for as long as is constitutionally permissible. Although the language employed in the D.C. Code is not as specific as the federal language in restricting the effectuation of a transferee's good time credits, certainly there is no clear indication in the D.C. Code that a transferee should be released "during the continuance of his mental illness" or before he is "restored to mental health." Indeed, if Congress had intended to exempt local prisoners from its general policy, it would seem more logical that it would have done so expressly, rather than indicating such an intent by remaining silent on the subject.

A fourth and final consideration—and the most critical—undermining the trial court's decision is the disparate treatment which different prisoners would receive as a result of our affirmance of that decision. The obvious discrepancy would be that federal

---

12. The federal transfer statute establishes a board of examiners for each federal penal institution, which is to examine any inmate of the prison alleged to be mentally unsound. The board reports its findings to the Attorney General, who, upon receiving the report, determines whether (and to which institution) the inmate should be committed. 18 U.S.C. § 4241 (1970). .

The D.C. Code provision, on the other hand, establishes a procedure whereby a prisoner alleged to be mentally ill is referred to a psychiatrist, who then determines whether the prisoner should be transferred to a mental hospital. D.C. Code 1973, § 24–302. In *Matthews v. Hardy*, 137 U.S.App.D.C. 39, 420 F.2d 607 (1969), the circuit court supplemented the requirements of the local procedures by ruling that due process necessitates a hearing and such other safeguards as are mandated under the 1964 Civil Commitment Act, D.C. Code 1973, § 21–501 *et seq.*

prisoners transferred to a mental hospital would be covered by the restrictive language in 18 U.S.C. § 4241, while local prisoners who are transferred—perhaps to the very same hospital—would be free to leave, even if still mentally ill, at their short-term release date. This problem would be aggravated by the fact that not all D.C. Code violators are sent to District of Columbia penal facilities; some serve their sentences in any one of a number of federal institutions. Thus, if they are determined to be mentally ill, some D.C. prisoners would be transferred under D.C. Code 1973, § 24–302, while others would be transferred under 18 U.S.C. § 4241. We do not believe that Congress rationally could have concluded that such disparate treatment would be warranted, based solely on the fortuitous place of an inmate's confinement—which is a decision to be made in either case by the Attorney General. The policy reflected in the restrictive language of § 4241 bears no relationship to the crime which the transferee has committed, or to the place from which he has been transferred. The holding in abeyance of the inmate's good time under § 4241 reflects Congress' opinion that the inmate should receive continued treatment after his short-term release date if necessary. We are unable to conclude that Congress believed that a local prisoner would have any less need for continued treatment, or would be any less a danger to himself or society if released prematurely, than would be a federal prisoner.[13]

Accordingly, we hold that a prisoner transferred from a District of Columbia penal facility to a mental hospital under § 24–302 is not entitled to mandatory release at the expiration of his short-term sentence unless he has been appropriately certified as being "restored to mental health" pursuant to § 24–303. We find that the language of § 24–302 and § 24–303 sufficiently reflects the spirit of the good time limitations embodied in 18 U.S.C. § 4241 so that the same restrictions established by the federal provision should apply to those transferred under the local statute. Although § 24–302 is open-ended in that it would detain a transferee indefinitely "during the continuance of his mental illness," the Supreme Court's decision in *Baxstrom v. Herold,* 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966), places an outside limit on retention of such a prisoner pursuant to a judgment of conviction as the expiration of his maximum sentence. *But see* note 11, *supra.* Therefore, § 24–302's limitation of good time should operate in virtually the same manner as does that of § 4241.

In reaching this result, we are aware that any statute which restricts liberty "must be narrowly, even grudgingly construed." *Covington v. Harris,* 136 U.S.App. D.C. 35, 41, 419 F.2d 617, 623 (1969). We also are mindful of the Supreme Court's repeated admonitions that a court should "not interpret a . . . criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what Congress intended." *Ladner v. United States,* 358 U.S. 169, 178, 79 S.Ct. 209, 214, 3 L.Ed.2d 199 (1958). *See also Simpson v. United States,* 435 U.S. 6, 98 S.Ct. 909, 55 L.Ed.2d 70 (1978), and cases cited therein. In the instant case, however, we are convinced that Congress' intent was as we have interpreted it. There is significant evidence that Congress intended local prisoners in mental hospitals to be detained

---

13. We recognize that Congress on occasion has passed laws which treat District of Columbia prisoners differently from federal prisoners, *e. g.,* in the areas of bail and parole. In general, there is nothing wrong with "tailoring local statutes to meet local needs." *United States v. Thompson,* 147 U.S.App.D.C. 1, 6, 452 F.2d 1333, 1338 (1971), citing *United States v. Sharpnack,* 355 U.S. 286, 78 S.Ct. 291, 2 L.Ed.2d 282 (1958). We find these situations inapposite to the case at hand, however, as we do not believe Congress found any compelling "local needs" to justify such disparate treatment of mentally ill transferees.

for treatment past their short-term release date if they are not healthy at that time; there is no solid evidence that Congress intended local prisoners to be excepted from the general policy of withholding the effectuation of good time credits pending treatment.

 The order of the Superior Court is reversed, and the case is remanded.[14]

*Reversed and remanded.*

14. Appellee's full-term release date (January 28, 1977) had been reached approximately five months prior to oral argument in this case. At oral argument, we raised the question of whether the case thus had become moot. Both the government and appellee took the position that it had not, for reasons which need not be set forth here. Irrespective of a mootness determination, we have concluded that the merits of this appeal should be resolved since the sole issue presented "is capable of repetition, yet evading review." *Roe v. Wade,* 410 U.S. 113, 125, 93 S.Ct. 705, 713, 35 L.Ed.2d 147 (1973), quoting *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911) (other citations omitted).

We refrain from suggesting what should be done with this case on remand, in part because of events which occurred subsequent to the trial court's Memorandum Opinion which we here reverse. These include (as a minimum): (1) a finding by a jury in a civil commitment proceeding that appellee was mentally ill but that he should not be committed; (2) an arrest thereafter of appellee for another criminal offense; and (3) a finding by another jury that appellee was not guilty of that offense by reason of insanity, which led to his recommitment to St. Elizabeths Hospital.