# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 21, 2009

Charles R. Fulbruge III
Clerk

No. 08-50409

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

TERRY MICHAEL MILLER

Defendant-Appellant

Appeal from the United States District Court
for the Western District of Texas

Before HIGGINBOTHAM, SMITH, and SOUTHWICK, Circuit Judges.

PER CURIAM:

On February 8, 2006, eight members of the Lone Star Fugitive Task Force—an interjurisdictional coalition of law enforcement officers—waited near a home in Elgin, Texas, where Terry Michael Miller was visiting his grandchildren. Miller was a fugitive from justice, wanted for parole violations relating to previous sentences—in his fifty year lifetime, Miller had accumulated an extensive criminal history of 12 prior felonies, including one for attempted murder. As Miller came out of the house, the officers flipped on their lights and pulled their cars toward the driveway where Miller had parked his green F-150 pickup. Miller's engine was running by the time the task force moved in. The officers exited their cars, guns drawn, wearing vests labeled POLICE or

MARSHALS. Among others, the force included Austin Police officer Kevin Rybarski, deputized as special federal marshal, and Special Deputy U.S. Marshall Keith Sartin, who was leading the investigation; they were among the officers approaching Miller's car from the back.

At trial, Task Force members testified that Miller looked over his shoulder at the officers around him, including at Rybarski and Sartin. Then, with tires squealing, he reversed toward them, attempting to escape in the narrow gap between their cars. Rybarski jumped out of the way, seriously injuring himself; he says he escaped Miller's pickup by a foot. Sartin also jumped out of the way. As Miller backed up, two other officers opened fire. One of them, Soto, hit Miller, whose hands flew off the wheel. Miller's truck crashed and flipped. He was extracted from the vehicle and taken to Brackenridge Hospital in Austin. Miller suffered serious jaw, neck, and chest injuries. Testifying in his own defense, Miller claimed that when he began accelerating, he sought to avoid Sartin, and that he never saw Rybarski. He said that he lost consciousness as a result of the gunshot just after he began accelerating and does not remember anything else.

On May 1, 2007, a grand jury in the Western District of Texas returned a two-count superseding indictment of Miller, for two counts of attempted forcible assault against federal officers engaged in their official duties by use of dangerous weapon.[1] After a jury trial, Miller was convicted of the crimes, on January 17, 2008. On April 14, Judge Yeakel sentenced Miller to 240 months of imprisonment for each of the two counts, with 60 months of one conviction running consecutively to the other, for a total sentence of 300 months of

---

[1] 18 U.S.C. § 111.

imprisonment. Miller timely appealed, challenging the evidentiary sufficiency for his assault conviction, the exclusion of photographic evidence of his gunshot wounds, and the multiplicitous convictions emerging from a single act of assault.

I

Miller failed at trial to move for a judgment of acquittal at the close of all evidence, so our review is for manifest miscarriage of justice.[2] This demanding standard requires Miller to demonstrate that the record is "devoid of evidence pointing to guilt."

Miller argues that the government failed to demonstrate the requisite level of intent for the crime. He claims that the evidence fails to show that Miller intended anything more than escape between the police vehicles: at most, he acted recklessly with regards to the officers, not knowingly or willfully, which is the required mens rea for this crime.

The government responds with Task Force testimony that before he accelerated toward them, officers saw Miller look at Sartin and Rybarski, evincing clear awareness that his actions would endanger them. Given that Miller intended the acceleration and knew the acceleration was likely to result in grave harm to the officers, Miller manifested the requisite level of intent for conviction. Of course, his ultimate *motive* was to escape and probably not to

_____

[2] "Defendants' sufficiency of the evidence claims are reviewed under a stricter than usual standard, because none of the defendants renewed their motions for judgment of acquittal at the close of all evidence. Under the stricter standard, review is for a 'manifest miscarriage of justice,' which is found if the record is 'devoid of evidence pointing to guilt.'" *U.S. v. Green*, 293 F.3d 886, 895 (5th Cir. 2002) (*quoting U.S. v. Ruiz*, 860 F.2d 615, 617 (5th Cir. 1988)) (internal citation omitted); *see also U.S. v. Phillips*, 477 F.3d 215, 219 (5th Cir. 2007). Miller cites no law to the contrary; in fact the cases he cites support the government's position.

injure officers, but this does not vitiate his ability to *intend*, in a legal sense, the assault as an intermediate matter, in that he knew that acts that he intended would in fact bring such harm.

Miller counters that when he stepped on the accelerator in his car, there is no competent evidence either that the officers were in the space into which Miller was driving, or more to the point, that Miller knew they were approaching that space. Miller continues that if, alternatively, the jury thought intent was formed *after* that point, that conclusion is foreclosed by the fact that Miller was shot early in the sequence of events and did not thereafter retain control of the truck.

Contrary to Miller's assertions, the government did not, at trial, rely on a theory of negligence or recklessness. Granting that the officers and Miller were all moving quickly in the heat of the moment, the government has produced sufficient evidence that Miller intended to assault Rybarski and Sartin by driving his large vehicle very quickly in their direction. Intent can be formed quickly, and the jury was not bound to accept Miller's account of the events surrounding his abortive escape over the accounts provided by the Task Force members.

II

At trial, Miller sought, unsuccessfully, to introduce a photograph of his wounds, apparently taken at Brackenridge shortly after the incident. The photograph, which we have reviewed in chambers, shows a bloody wound on the bottom of Miller's chin/jaw, stretching about halfway across his chin, and quite deep.

4

Miller claims that the extent of his wounds would have decisively convinced the jury that Miller could not possibly have formed the requisite intent or carried out the requisite acts supporting the attempted assault. It would demonstrate, he argues, that he was unconscious at the relevant time, having sustained egregious injuries. He argues that the exclusion was prejudicial because the government consistently downplayed the extent of Miller's injuries at trial, insinuating that the shot merely "grazed" him, and in any case failing to convey the egregious nature of the injury.

This evidentiary ruling is reviewed for abuse of discretion. Miller's argument founders first on relevance. As the government notes, Miller could certainly have formed an intent to assault before he was shot, and this seems to have been the dominant theory at trial. Even if it were not, there was ample testimony concerning the severity of Miller's injuries,[3] and when the allegedly misleading statements from the prosecution are taken in context, there is simply no support for the idea that they systematically minimize Miller's injuries. The jury was made amply aware that as he accelerated toward the officers, Miller was shot in the face and lost control of his vehicle. The introduction of a gruesome photograph would have added very little to the picture of Miller's

---

[3] This is part of a cross-examination of one of the officers:
Q: You stated that after the vehicle was on its top, you approached and you saw Mr. Miller's wound?
A: Yes, sir.
Q: Pretty severe wound?
A: Yes, sir, it was. . . .
Q: You just testified that you saw teeth, jaw. Pretty strong impact from that bullet?
A: Yes, sir.
Q: Pretty extensive damage, would you say?
A: I've seen stuff like that before, so, yes.

wounds no doubt already formed in jurors' imaginations, and in any case, it would not have aided at all in their determination of Miller's guilt or innocence.

There was no reversible abuse of discretion here.

## III

Miller raises several sentencing errors, and the first alleged error—concerning duplicative attempted assault charges for a single act—is decisive.[4]  Based on this error, as the government has conceded, Miller's sentences should be vacated, and the case should be remanded for resentencing. This is because under settled law, the single action of attempting to run over the officers cannot support two separate convictions.[5]  Here, since the erroneous second conviction significantly lengthened Miller's sentence, he was clearly prejudiced by it.  This unobjected-to error is subject to plain error analysis, and we choose to exercise our discretion to correct it.

We VACATE Miller's sentence and REMAND to the district court for further proceedings necessary to correct this error, and we AFFIRM the judgment below in every other respect.

---

[4] In light of our decision we pretermit consideration of the other alleged sentencing error.

[5] *See U.S. v. Shaw*, 701 F.2d 367, 396 (5th Cir. 1983) (citing to *Ladner* in interpreting this statute); *Ladner v. U.S.*, 358 U.S. 169 (1958) (overturning one of two convictions under the predecessor of this statute, because both officers were hurt by only one shotgun discharge).