**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Gregory CROUTHERS, Defendant-Appellant.**

**No. 80–2091.**

United States Court of Appeals, Tenth Circuit.

Argued and Submitted Nov. 19, 1981.

Decided Jan. 22, 1982.

Jerome C. Ramsey, Asst. U. S. Atty., Denver, Colo. (Joseph Dolan, U. S. Atty. and Robert Gay Guthrie, Asst. U. S. Atty., Denver, Colo., with him on the brief), for plaintiff-appellee.

Richard B. Deutsch, Denver, Colo., for defendant-appellant.

Before BARRETT, DOYLE and LOGAN, Circuit Judges.

BARRETT, Circuit Judge.

Crouthers was convicted of armed bank robbery in violation of 18 U.S.C. § 2113(a), (d) and 2.

On appeal Crouthers contends that (1) the evidence was insufficient to show that Salski was assaulted or his life put in jeopardy and the robbery was accomplished by the use of a dangerous weapon; (2) the trial court erred in instructing the jury; (3) the trial court erred in denying his motions for mistrial; (4) the trial court did not make a sufficient determination as to the voluntariness of Mrs. Crouthers' testimony and improperly limited cross-examination of Mrs. Crouthers; and (5) he was denied effective assistance of counsel.

On May 12, 1980, Crouthers and a companion, Robert Salski, were approached by a man, later identified as Garvin Trimm, as they were leaving Crouthers' apartment to go to dinner. Crouthers told Salski that Trimm had a gun in Crouthers' back. Salski did not know at that time that Crouth-

ers and Trimm were acquaintances and that they had planned the developing scenario. Trimm ordered the men into Salski's car and told Salski to drive to the Regatta Shopping Center in Aurora, Colorado. Trimm threatened the two men by telling them to cooperate and nobody would get hurt. At the shopping center, Trimm directed Salski to the Aurora National Bank automatic teller facility. Salski was a Wells Fargo employee and, as such, had keys to the banking facility. Acting on Trimm's orders, Salski unlocked the safes in the facility and placed $13,650.00 of bank funds in a briefcase. Trimm then ordered the men back into the car. They returned to the area of Crouthers' apartment where Trimm took his leave. Salski contacted the Wells Fargo office and then returned to the automatic teller facility. The FBI was contacted. After FBI agents interviewed both Salski and Crouthers, Crouthers' apartment was searched with his consent. Nothing connecting Crouthers with the robbery was found at that time.

The next day Crouthers, his wife Terry, and Trimm flew from Denver to Chicago. Trimm went on to Indiana. The Crouthers-es continued on to New York. When they returned from New York, Terry Crouthers contacted the FBI and informed that she suspected her husband may have been involved in the bank robbery. Although Mrs. Crouthers had been separated from her husband for a few weeks and was, at that time, living with her parents, she had a key to the apartment. The FBI conducted another search of the apartment with the consent of Terry Crouthers. This search revealed evidence connecting Crouthers with the robbery.

Eventually Trimm was arrested for the bank robbery. Prior to his arrest he gave false statements to the FBI exculpating himself from any involvement in the robbery. Subsequently, a plea agreement was entered into whereby Trimm was charged with a lesser offense in exchange for his promise to testify against Crouthers. Trimm's testimony at trial revealed that on May 9, 1980, three days prior to the robbery, Crouthers, Trimm's former teacher and friend, asked him to come to his apartment. At the apartment, Crouthers told Trimm that he planned to rob a bank and that Trimm was going to help him. According to Trimm's testimony, Crouthers was the mastermind behind the whole plan. Crouthers set up the meeting with Salski, who Crouthers knew from his previous work at Wells Fargo. On the night of the robbery, Crouthers supplied Trimm with the briefcase for the money and with a loaded gun. Trimm testified that Crouthers instructed him to keep the gun pointed at Crouthers at all times. Crouthers did not know that Trimm removed the bullets from the gun prior to the robbery. After the robbery, Trimm left some of the money in a camera case on the bed in Crouthers' apartment. However, the first search of the apartment by the FBI on the night of the robbery failed to uncover the money. Trimm testified that he put the rest of the money in a speaker box which was recovered in the second search of Crouthers' apartment.

During the course of the trial it became apparent that defense counsel had not been provided with a statement made by Crouthers to the FBI. Defense counsel moved for a mistrial. The court ruled that the FBI agent who had taken the statement would not be allowed to testify and no mention of the statement was to be made. Subsequently, it was discovered that defense counsel had not been supplied with a statement made by Trimm to the FBI. Defense counsel was then supplied with a copy of the Trimm statement and given a few minutes to read it. Once again, defense counsel moved for a mistrial. The court denied the motion but ruled that the prosecution could not use the Trimm statement.

## I.

Crouthers contends that because Salski did not see the gun and because the gun was unloaded, the evidence was insufficient to show that Salski was assaulted or his life put in jeopardy. Furthermore, he contends that the evidence was insufficient to show

that the robbery was accomplished by the use of a deadly weapon.

■ This court has rejected the objective test on these elements of armed robbery. Instead, we are guided in our review by the "reasonable man" standard as set out in *United States v. Beasley*, 438 F.2d 1279 (6th Cir. 1971), *cert. denied*, 404 U.S. 866, 92 S.Ct. 124, 30 L.Ed.2d 1101 (1971), *reh. denied*, 404 U.S. 960, 92 S.Ct. 310, 30 L.Ed.2d 278, 404 U.S. 1006, 92 S.Ct. 566, 30 L.Ed.2d 559 (1971), *quoted with approval* in *United States v. Shannahan*, 605 F.2d 539 (10th Cir. 1979). Under the *Beasley* test the evidence must establish that the defendant,

... created an apparently dangerous situation, (b) intended to intimidate his victim to a degree greater than the mere use of language, (c) which does, in fact, place his victim in reasonable expectation of death or serious bodily injury.

438 F.2d at 1282.

■ In applying this test, we must view the evidence as it appeared to Salski at the time of the crime and not through hindsight. The evidence established that at the time of Salski's encounter with Trimm the lighting conditions were poor [R., Vol. III at p. 142], that Crouthers told him that he thought "the guy" had a gun on him, and that Salski thought Crouthers was kidding until Crouthers repeated the remark about the guy having a gun [R., Vol. III at p. 137]. Trimm told Salski, "Just take it easy and your friend here won't get hurt." [R., Vol. III at p. 138]. While the men were in the car driving to the shopping center, Salski heard Crouthers say, "don't shoot, don't hurt us" [R., Vol. III at p. 143]. Salski testified that he was afraid for Crouthers; that he felt indirectly threatened because he didn't know what the gunman was going to do; and he thought that the gunman might shoot or kidnap them. [R., Vol. III at pp. 161, 170].

This testimony evidences that Salski perceived a dangerous situation, that he felt intimidated due to the belief that the perpetrator may have had a gun, and that he did have an expectation of death or serious injury. The inquiry, resolved by the jury, involved the reasonableness of Salski's beliefs. It would be unreasonable to expect the victim of a crime, such as Salski, to risk his life in order to positively ensure that his assailant did indeed have a weapon and that the weapon was loaded. Thus we hold that the evidence was sufficient to establish that Salski's life was in jeopardy. In like manner, we hold that the evidence was sufficient to establish that a dangerous weapon was used to effect the crime.

■ The inquiry is whether Salski perceived the situation as involving a dangerous weapon and, if so, whether the perception was reasonable. In light of the testimony concerning comments made by both Crouthers and Trimm, it is apparent that Salski reasonably perceived the use of a dangerous weapon. In *Baker v. United States*, 412 F.2d 1069 (5th Cir. 1969), *cert. denied*, 396 U.S. 1018, 90 S.Ct. 583, 24 L.Ed.2d 509 (1970), the court said,

A gun is commonly known, regarded and treated by society as a dangerous device by both the reasonable man and the person at whom it is pointed, without pause to determine whether a round is in the chamber. ... We hold that a gun used in connection with and at the scene of a bank robbery is as a matter of law a dangerous weapon and those on the immediate scene of the robbery are placed in an objective state of danger regardless of whether there is proof that the gun was loaded.

412 F.2d at 1071–72. *See also: United States v. Marx*, 485 F.2d 1179 (10th Cir. 1973), *cert. denied*, 416 U.S. 986, 94 S.Ct. 2391, 40 L.Ed.2d 764 (1974) (fake bombs constituted dangerous weapon); *United States v. Cooper*, 462 F.2d 1343 (5th Cir. 1972), *cert. denied*, 409 U.S. 1009, 93 S.Ct. 452, 34 L.Ed.2d 303 (1972) (simulated bomb is dangerous weapon); *United States v. Beasley, supra*.

Accordingly, we hold that Crouthers' contention that the evidence was insufficient to support his conviction is without merit.

## II.

Crouthers assigns error to the trial court's instructions to the jury. He first claims the court erred in refusing to give a lesser included offense instruction on simple robbery. Whether or not a lesser included offense instruction is appropriate depends on the evidence, and the trial court is in a unique position to determine whether or not the instruction should be given. Thus, the trial court's determination will not be disturbed on appeal in the absence of an abuse of discretion. *United States v. Chapman*, 615 F.2d 1294 (10th Cir. 1980), *cert. denied*, 446 U.S. 967, 100 S.Ct. 2947, 64 L.Ed.2d 827 (1980).

Crouthers claims that there was a factual dispute, based upon the reasons set out in his first assignment of error, as to whether the robbery was accomplished by assaulting or placing in jeopardy the life of another by the use of a dangerous weapon. Based upon the facts heretofore recited, we disagree. There was no factual dispute concerning the manner in which the robbery was accomplished. The evidence is uncontradicted that a gun was used to perpetrate the crime. Although Crouthers did not testify, it is apparent that his defense was anchored to the proposition that he did not participate in the robbery other than as a victim. [R., Vol. III at p. 128]. In a similar situation, a court said:

> There was no dispute in the proof on the element of assault—the Government's evidence showed that the robbery was conducted with firearms and that threats to kill were made; defendant testified he did not participate in the robbery at all. Thus there was nothing from which the jury could conclude that defendant robbed the bank but did so without committing an assault or placing lives in jeopardy. We find no error in the refusal to give these instructions on defendant's theory of the case instruction.

*United States v. Callison*, 577 F.2d 53, 56 (8th Cir. 1978), *cert. denied*, 439 U.S. 873, 99 S.Ct. 209, 58 L.Ed.2d 187 (1978).

Crouthers next assigns plain error in the court's instruction concerning the meaning of putting a life in jeopardy.[1] More specifically, Crouthers complains about the use of the phrase "or to the fear of death". He contends that the instruction leads the jury to convict based upon the subjective fear of the victim. In *United States v. Marx, supra*, we considered the prejudicial effect of an identical instruction. We there held that the giving of the instruction was harmless error inasmuch as there was no evidence in the case that the victim's life was not in an objective state of danger. In *Marx* we adopted the *Beasley* test as to what constitutes an objective state of danger. We have noted that Salski's life was in an objective state of danger. Thus we conclude that any error in giving the instruction was harmless error.

Because of our reliance on *Beasley*, we reject the rationale of *United States v. Marshall*, 427 F.2d 434 (2d Cir. 1970) cited by Crouthers. In *Marshall* the court found that it was reversible error to give an instruction stating that to put a life in jeopardy meant to expose a person to a risk of death or fear of death. There was evidence in the case that one of the guns used in the robbery was unloaded. The *Marshall* court requires a showing that the robber had an actual as opposed to an apparent ability to inflict bodily harm. On this basis, it held that the "fear of death" language was prejudicial. We do not adhere to the view that actual ability to inflict harm must be shown. Consequently, we hold that the instruction given was harmless error.

## III.

Crouthers further alleges that the trial court's refusal to grant his motions for mistrial was error.

Crouthers' first motion for mistrial stemmed from the Government's failure to supply him with a statement he made to an

---

1. To put in jeopardy the life of a person by the use of a dangerous weapon or device means, then, to expose such person to a risk of death or to the fear of death by the use of such dangerous weapon or device.

FBI agent. In a pretrial discovery conference the Government agreed to supply the defendant with all written statements of the defendant in its possession, pursuant to Fed.R.Crim.P. 16(a)(1)(A), 18 U.S.C. Under rule 16(d)(2) the remedies for failure to comply with a discovery request include precluding the party from introducing the evidence not disclosed or any other order "as it deems just under the circumstances."

When the trial court became aware that the Government had failed to supply Crouthers with his statement, the court ordered that the FBI agent who had conducted the interview and transcribed the statement would not be allowed to testify and, further, that no mention of the statement was to be made through any other witness. Crouthers claims that notwithstanding the court's order, the defendant was still presented with a surprise and that defense counsel's opening statement on credibility was undermined. This bald assertion does not establish a showing of prejudice sufficient to justify a mistrial.

█ Crouthers' second motion for a mistrial was made when it became apparent that the Government had failed to supply the defense with a statement made by Trimm to the FBI. The omission was discovered during Trimm's direct examination. Trimm testified that he made the statement and that it was "a bunch of nonsense". The details of the statement were not disclosed. This statement was subsequently submitted to defense counsel during trial. The court allowed counsel a few minutes to read it. The court then denied Crouthers' motion for mistrial but prohibited the Government from using the statement, although defense counsel was allowed to use the statement. Crouthers claims that his right to cross-examine Trimm was effectively foreclosed and that he was denied a fair trial. The record reveals, however, that defense counsel's cross-examination of Trimm was very thorough. Trimm admitted that he had lied on several occasions and that at the time of the robbery he was in need of money.

The Jencks Act provides that the statement of a government witness is not discoverable until the witness has testified. 18 U.S.C. § 3500. The Act allows the court, *in its discretion*, to recess in order to give the defense an opportunity to review the statement. The sanctions provided in the Act, elimination of the witnesses' testimony or mistrial, are only available if the government *elects* not to produce the statement. Consequently, Crouthers cannot claim error under the Jencks Act. Its provisions were fully complied with. The Government's delay was rendered harmless by the court's order.

█ Crouthers asserts that, in any event, the non-disclosure amounted to a violation of the rule of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

*Brady* allows discovery by the defendant of any exculpatory material in the possession of the government. We have reviewed the Trimm statement in issue and find nothing in it of an exculpatory nature. Rather, the statement appears to inculpate Crouthers. Arguably, the statement could have been used to impeach Trimm's credibility which was certainly an important role in the trial, inasmuch as Trimm was the Government's main witness. However, on both direct and cross-examination, Trimm admitted that this statement was false. [R., Vol. III at pp. 226, 246, 248]. As previously noted, defense counsel did a thorough job of impeaching the witness. We hold that disclosure of the Trimm statement would not have necessarily affected the outcome of the trial; consequently, a mistrial was not warranted. *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

We hold that the trial court effectively cured any prejudice that may have resulted from the Government's failure to produce the Trimm statement. Crouthers' claim that he was denied a fair trial is without merit.

## IV.

Crouthers' next assignment of error concerns the testimony of his wife, Terry Crouthers. Prior to his wife's testimony,

the court held a hearing on the substance and admissibility of Mrs. Crouthers' testimony. The court ruled that Mrs. Crouthers would be allowed to testify with regard to her observations and conversations she had with her husband in the presence of third parties but that she would not be allowed to testify as to their private conversations. This ruling was in accord with *Trammel v. United States*, 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980).

■ Crouthers complains that the trial court's inquiry as to the voluntariness of the wife's testimony was inadequate, and in support thereof he states that Mrs. Crouthers was 19 years of age, that counsel for both parties and the FBI questioned her prior to trial and that she was receiving threatening letters.

Prior to Mrs. Crouthers' testimony, and out of the presence of the jury, the court informed Mrs. Crouthers that she had a choice as to whether or not she would testify. In response, Mrs. Crouthers indicated her desire to testify. [R., Vol. IV at p. 287A]. On cross-examination, Mrs. Crouthers acknowledged that she had a right not to testify but that she chose to do so. [R., Vol. IV at p. 313]. Significantly, in the course of defense counsel's closing argument, it was acknowledged that Mrs. Crouthers wanted to testify even though she had a right not to do so. [R., Vol. V at p. 457]. We hold that Mrs. Crouthers knowingly and intelligently waived her privilege not to testify against her husband.

■ Crouthers further contends that the trial court erred in limiting the cross-examination of Mrs. Crouthers. More specifically, Crouthers objects to the trial court's ruling that he would not be allowed to elicit testimony from Mrs. Crouthers concerning the facts underlying a fight between Mr. and Mrs. Crouthers. In response to cross-examination, Mrs. Crouthers admitted that she and her husband had had a fight prior to the robbery and that the fight concerned another man. Mrs. Crouthers also admitted that she had said something to the effect of "getting even" with Crouthers. Even so, we find no merit in Crouth-

ers' argument that the trial court's ruling precluded him from establishing the witness' bias and foreclosed his right to confront witnesses against him. We have previously delineated the permissible scope of cross-examination to establish bias in *Abeyta v. United States*, 368 F.2d 544 (10th Cir. 1966) wherein we said,

> Although cross-examination pertinent to the credibility of a witness and for the development of facts which may tend to show bias or prejudice should be given the "largest possible scope", nevertheless, as we said in *Foster v. United States*, 10 Cir., 282 F.2d 222, 224: "the trial court is the governor of the trial with the duty to assure its proper conduct and the limit of cross-examination necessarily within its discretion." See, also, *Jennings v. United States*, 10 Cir., 364 F.2d 513.

368 F.2d at 545.

We find no abuse of discretion in the court's ruling limiting the cross-examination of Mrs. Crouthers.

## V.

■ Finally, Crouthers asserts that, as a result of various rulings by the trial court in addition to certain omissions on trial counsel's part, he was denied effective assistance of counsel. The trial court's alleged prejudicial rulings have been heretofore discussed and found to be proper or in any event, harmless if erroneous. Accordingly, we hold that Crouthers was not denied effective assistance of counsel as a result of the trial court's rulings.

■ In regard to the omissions of trial counsel which Crouthers contend establish ineffective assistance of counsel, we deem it necessary to address only one such claimed omission. Our concern is directed at trial counsel's failure to move to suppress the evidence seized from Crouthers' apartment. The search of the apartment was conducted at Mrs. Crouthers' instigation and with her consent on May 21, 1980. Mrs. Crouthers testified that she had moved out of the apartment on May 8, 1980 and that she was living with her parents at the time of the

search. There is a lack of evidence as to what extent Mrs. Crouthers in fact "moved out" of the apartment. It is apparent, however, that Mrs. Crouthers had not abandoned her marriage or the apartment completely. On May 13, 1980 Mrs. Crouthers accompanied her husband to New York. She testified that following their return from New York she was with her husband at the apartment when she observed a speaker box which was recovered in the subsequent search and introduced into evidence at trial. [R., Vol. IV at p. 303]. Mrs. Crouthers also testified that she let the FBI into the apartment. [R., Vol. IV at p. 302]. Agent Lighthall of the FBI testified that Mrs. Crouthers had a key to the apartment, and that when the FBI conducted the first search with Mr. Crouthers' consent he indicated that he did not have a key to the apartment but that his wife did. [R., Vol. IV at pp. 415, 417].

Viewing the evidence in the light most favorable to the Government, together with all reasonable inferences to be drawn therefrom, we hold that at the time of the search Mrs. Crouthers had control over the apartment and was authorized to consent to the search. Other courts have reached the same result under similar circumstances. *United States v. Long*, 524 F.2d 660 (9th Cir. 1975); *United States v. Lawless*, 465 F.2d 422 (4th Cir. 1972); *United States ex rel. Cook v. Cliff*, 341 F.Supp. 1038 (E.D.Pa. 1972).

The standard of review when ineffective assistance of counsel is alleged is whether the trial counsel exercised the "skill, judgment and diligence of a reasonably competent defense attorney." *Dyer v. Crisp*, 613 F.2d 275 (10th Cir. 1980), *cert. denied*, 445 U.S. 945, 100 S.Ct. 1342, 63 L.Ed.2d 779 (1980). It is clear that "[e]ffective assistance does not demand that every possible motion be filed, but only those having a solid foundation." *United States v. Hines*, 470 F.2d 225 (3d Cir. 1972), *cert. denied*, 410 U.S. 968, 93 S.Ct. 1452, 35 L.Ed.2d 703 (1973). Nor does the Sixth Amendment require an errorless defense. *Dyer v. Crisp, supra.* In light of these

standards, we hold that there is no merit in Crouthers' contention that he was denied effective assistance of counsel.

WE AFFIRM.