[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 09, 2001
THOMAS K. KAHN
CLERK

No. 99-11329

D.C. Docket No. 98-00373-CR-J-21C

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

THOMAS E. FALLEN,

Defendant-Appellant.

Appeal from the United States District Court
for the Middle District of Florida

**(July 9, 2001)**

Before TJOFLAT and HULL, Circuit Judges, and PROPST*, District Judge.

_____
* Honorable Robert B. Propst, U.S. District Judge for the Northern District of Alabama, sitting
by designation.

TJOFLAT, Circuit Judge:

This is a direct appeal from a conviction for forcibly assaulting two federal officers in violation of 18 U.S.C. § 111(a)(1) (1994).[1] The defendant, Thomas Fallen, challenges his conviction on the grounds that (1) the evidence was insufficient to sustain a conviction under section 111(a); (2) the district court abused its discretion in failing to give the defendant's proposed jury instructions on forcible and simple assault; and (3) the district court abused its discretion in admitting into evidence his prior firearm-related convictions and testimony that one of the federal agents had been previously fired upon three times in the line of duty.[2]

I.

At 5:05 a.m. on October 4, 1998, Thomas Fallen of Jacksonville, Florida

---

[1] 18 U.S.C. § 111(a)(1) provides:
Whoever
    (1) forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of official duties;
. . .
Shall where the acts in violation of this section constitute only simple assault, be fined under this title or imprisoned not more than one year, or both, and in all other cases, be fined under this title or imprisoned not more than three years, or both.

[2] As relief on his first ground, Fallen asks that we direct the district court to enter a judgment of acquittal. As to the remaining grounds, Fallen contends that, whether considered individually or collectively, he should be granted a new trial.

called the Secret Service in Washington, D.C. to report a threat against the President. Fallen told Agent Larsen that his son, Troy, had threatened to "blow the President's head off with a shotgun." Throughout the call, Fallen was stumbling over his words and giving inconsistent statements; he also became confused when asked for his phone number, leading Larson to believe he was probably intoxicated. When asked, Fallen admitted that he had been drinking. Larson mentioned this in his report, wherein he described Fallen as "very drunk" and "confused."

At 5:17 a.m., Larson phoned Agent Mikosky in the Jacksonville regional Secret Service office and asked him to follow up on Fallen's phone call. Mikosky phoned Agent Fultz, also in the Jacksonville office, and requested that he run a criminal history check on Fallen. When Fultz ran the check, he found three prior gun-related incidents: a conviction for possessing a concealed weapon in 1975, an arrest for possessing a concealed weapon in 1983, and a conviction for making a false statement in connection with a gun purchase in 1990. With this information in hand, Mikosky and Fultz advised local police of the situation and, at approximately 11:00 a.m., went to Fallen's house to investigate the reported

3

threat.[3]

When Mikosky and Fultz arrived at Fallen's house, they knocked on his front door. A male voice from inside the house, identified by the agents at trial as Fallen's, called out, "Who is it?" Mikosky replied that he was with the Secret Service and was looking for Fallen. Fallen responded, in what Mikosky described at trial as a "very loud" and "very angry" voice, that he had a gun and would shoot the agents if they did not leave his property. The agents backed away from the door and Agent Mikosky identified himself again, saying, "This is Agent Mikosky with the Secret Service, you called us." At that point, Mikosky looked at the window to the right of the door and noticed someone pulling back the curtain. Although he could not see who was there, Mikosky pointed to his badge and said, "Mr. Fallen, we're the Secret Service, you called us." Just before he finished his sentence, however, Fallen repeated that he had a gun and would shoot and kill the agents if they did not leave his property.

In the face of Fallen's repeated threats, the agents went back to their car and drove out of the immediate area.[4] They then went to a neighbor's house and

---

[3] Mikosky testified at trial that he waited nearly six hours to contact Fallen because he was aware that Fallen appeared to have been heavily intoxicated at 5:05 a.m.; Mikosky was hoping that Fallen would "sober up" by the time the agents arrived.

[4] Fearful that he would indeed be fired upon, Agent Mikosky drew his sidearm but kept it concealed while he carefully retreated to the car. Agent Fultz had his hand on his sidearm,

4

telephoned Fallen, explaining that they just wanted to talk to him about the complaint he had made. Fallen told Mikosky that he would not come out of the house because he believed the agents would arrest him. When the agents told him that they did not intend to arrest him, Fallen agreed to talk to the agents through the solid front door. Mikosky told him that arrangement was unacceptable, however, because the agents feared that Fallen might shoot them if they reentered his property. Although Fallen replied, "I won't have a gun," Mikosky suggested that Fallen open the solid front door and stand behind the screen door so the agents could see his hands. Fallen agreed, but had to be reminded during the ensuing interview to keep his hands in sight.

When the agents returned to Fallen's house, Fallen told them that his son, who had visited him seven days ago, had become incensed when he saw a card bearing a picture of President Clinton and the First Lady. Fallen's son stated that he was going to Washington, D.C. to "blow [the President's] head off with a shotgun." During the interview, which lasted five minutes, Fallen did not appear to be intoxicated; his speech was clear and articulate.

Two and one-half weeks later, on October 22, 1998, the agents returned to Fallen's house with a warrant and arrested him. On October 29, a Middle District

which was contained in a "fanny pack" he wore around his waist.

5

of Florida grand jury indicted Fallen on one count of assaulting a federal officer in violation of 18 U.S.C. § 111(a)(1). Fallen's trial began on January 6, 1999. At the close of the Government's case, Fallen's attorney moved the court for a judgment of acquittal and, after the court took the motion under advisement, rested without calling any witnesses. The jury returned a guilty verdict on January 7. On April 27, 1999, the district court denied Fallen's motion for a judgment of acquittal, and sentenced Fallen, who had been detained in custody, to time served and one year supervised release.[5]

## II.

## A.

Fallen's first ground for reversal is that the evidence at trial was insufficient to sustain a conviction for forcible assault under 18 U.S.C. § 111(a)(1). Questions about the sufficiency of the evidence produced at trial are reviewed de novo. United States v. Keller, 916 F.2d 628, 632 (11th Cir. 1990). We must view all evidence in the light most favorable to the United States, with all reasonable inferences drawn in its favor. Id. To uphold the district court's denial of the

---

[5] On July 28, 1999, Fallen violated the terms of his supervised release and was sentenced to ten months' imprisonment. It appears that Fallen is no longer incarcerated.

motion for judgment of acquittal and the jury's verdict, we need only find that a reasonable fact finder could have concluded that the evidence established the defendant's guilt beyond a reasonable doubt. Id.

Forcible assault has been defined as "any willful threat or attempt to inflict bodily injury upon the person of another when coupled with an apparent present ability to do so, and includes any intentional display of force such as would give the victim reason to fear or expect immediate bodily harm." United States v. Renfro, 620 F.2d 497, 500 (5th Cir. 1980) (emphasis added).[6] Clearly, Fallen willfully threatened to inflict bodily injury upon the agents when he stated that he would shoot them with a gun. Under the totality of the circumstances, the agents were reasonably afraid of being shot – they were repeatedly threatened by an angry-sounding, possibly intoxicated felon with prior convictions involving firearms. Moreover, the agents knew that Fallen could see them and was within shooting range, as they could hear him behind the door and saw a hand moving the window curtain.

Fallen contends in his brief, however, that the evidence at trial did not establish a forcible assault because he "did not engage in any physical contact with

---

[6] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

the agents." Moreover, because he did not "display any weapons . . . [t]here was no evidence presented that indicated Fallen had the apparent ability to harm the agents." (emphasis added.)

This circuit and others have held that "proof of actual physical contact is not required to violate § 111." United States v. Chambers, 195 F.3d 274, 277 (6th Cir. 1999); see also United States v. Hernandez, 921 F.2d 1569, 1577 (11th Cir. 1991) ("[t]he statute may be violated . . . by minimal physical contact, or even without the presence of any physical contact") (internal citations omitted); United States v. Fernandez, 837 F.2d 1031, 1035 (11th Cir. 1988) (citing United States v. Mathis, 579 F.2d 415, 418 (7th Cir. 1978), for the proposition that "evidence that [the] accused used some quantum of force or threat of force is sufficient to support conviction under section 111"). Fallen argues that because these cases were decided before section 111 was amended by the Violent Crime Control Act of 1994 to add the lesser included offense of simple assault, they are no longer good law to the extent that they allow mere threats of force to constitute a forcible assault. Now, Fallen avers, all threats of force unaccompanied by physical contact must be treated as simple assaults under section 111. Fallen cites no case law for this proposition, and we find no post-1994 Eleventh Circuit decisions addressing the issue. Other circuits have rejected Fallen's overly broad definition of simple

8

assault, however, and have held instead that the more narrow common law definition of simple assault applies to section 111. See United States v. Chestaro, 197 F.3d 600, 605-06 (2d Cir. 1999). We think that this is the better view.

At common law, simple assault is defined as "a willful attempt to inflict injury upon the person of another, or . . . a threat to inflict injury upon the person of another which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm." Id. at 605 (internal quotation omitted); see also United States v. LeCompte, 108 F.3d 948 (8th Cir. 1998). A forcible assault would therefore have to be something more, such as a willful attempt or threat to inflict serious bodily injury, coupled with an apparent present ability, which causes the intended victim a reasonable apprehension of immediate serious bodily harm or death. Cf. Chambers, 195 F.3d at 277 ("The element of force necessary for a [forcible assault] conviction under [section 111] may be shown by such a threat or display of physical aggression toward the officer as to inspire fear of pain, bodily harm, or death.") (internal quotation and citation omitted). Fallen certainly threatened serious bodily injury and, by his words and actions, gave the agents reasonable cause to fear such injury or death. Thus, the fact that Fallen never made physical contact with the agents does not lessen the degree of the assault.

9

That Fallen did not "display" a weapon so that the agents could see it is of no moment, as Fallen's "present apparent ability" to harm the agents was established by his repeated assertion that he had a gun and was willing to use it. While we can find no case in this circuit addressing whether the victim of a forcible assault must actually see the weapon with which he is threatened, we are guided by the reasoning set forth in United States v. Crouthers, 669 F.2d 635 (10th Cir. 1982). Crouthers and his confederate, Garvin Trimm, conspired to use Robert Salski, a Wells Fargo employee, to rob an automatic bank teller facility. Crouthers, an acquaintance of Salski's, masterminded the robbery plan. He supplied Trimm with a briefcase for the money and a loaded gun. He then set up a meeting with the unwitting Salski, who had the keys to the bank facility, and arranged for Trimm to accost them both as they left Crouthers's apartment to go to dinner. Crouthers's plan was to pretend that he, too, was merely an unfortunate victim of the robbery. Id. at 637-38.

Trimm approached Crouthers and Salski in accordance with the plan, and Crouthers told Salski that Trimm had a gun to Crouthers's back. Salski never saw the gun. Trimm told Salski, "just take it easy and your friend here won't get hurt." Id. at 639. In fact, unbeknownst to both Crouthers and Salski, Trimm had removed the bullets from the gun. Id. at 638. Trimm directed Salski to drive the trio to the

10

automatic teller facility, unlock the safes, take the money (which amounted to $13,650.00) and put it in his briefcase.  Id.  While en route, Salski heard Crouthers say, "don't shoot, don't hurt us."  Id. at 639.  After taking the money, Trimm ordered the men back into the car.  They returned to the area of Crouthers' apartment where Trimm took his leave.  Id. at 638.

After a prolonged investigation, Crouthers was charged and convicted of armed bank robbery in violation of 18 U.S.C. §§ 2113(a), (d) and 2.  Section 2113 provides, in pertinent part:

> (a) Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another, or obtains or attempts to obtain by extortion any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association; or
> Whoever enters or attempts to enter any bank, credit union, or any savings and loan association, or any building used in whole or in part as a bank, credit union, or as a savings and loan association, with intent to commit in such bank, credit union, or in such savings and loan association, or building, or part thereof, so used, any felony affecting such bank, credit union, or such savings and loan association and in violation of any statute of the United States, or any larceny–
> Shall be fined under this title or imprisoned not more than twenty years, or both.
> . . .
> (d) Whoever, in committing, or in attempting to commit, any offense defined in subsections (a) and (b) of this section, assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device, shall be fined under this title or imprisoned not more than twenty-five years, or both.

11

In his appeal, Crouthers contended that because Salski did not see the gun, the evidence was insufficient to show that Salski was assaulted or his life put in jeopardy as required for conviction under subsection (d). Id. at 637. The court, in rejecting Crouthers's argument, noted that "[i]t would be unreasonable to expect the victim of a crime, such as Salski, to risk his life in order to positively ensure that his assailant did indeed have a weapon . . . ." In light of Crouthers's and Trimm's unambiguous statements about the gun in Salski's presence, the court held that "Salski reasonably perceived the use of a dangerous weapon." Id. at 639.

We agree with the reasoning of Crouthers. It would indeed be unreasonable to require federal agents in situations such as this one to risk serious injury or death to ensure that their assailant is actually in possession of a dangerous weapon. Rather, concealed assailants who assert that they are in possession of a loaded firearm do so at their peril. When the totality of the circumstances supports a reasonable inference that the assailant is armed, a law enforcement officer is entitled to take the assailant at his word. In the case before us, Agents Mikosky and Fultz were aware of Fallen's prior convictions involving firearms, knew that he may have been intoxicated, and were repeatedly told after identifying themselves that they would be fired upon. Notably, Fallen was not shouting at the agents from deep within the house or from his backyard – he was just on the other

12

side of the door, looking at the agents through a window.  Under these circumstances, we hold that Fallen's ability to inflict imminent and serious bodily harm upon the agents was "apparent" enough to constitute a forcible assault under 18 U.S.C. § 111.

Given the foregoing, a reasonable fact finder could have concluded that the evidence established Fallen's guilt beyond a reasonable doubt.  We therefore hold that the district court properly denied Fallen's motion for a judgment of acquittal, and that the jury's verdict is supported by sufficient evidence.

B.

Fallen contends that he should be granted a new trial because the district court abused its discretion in failing to give his proposed jury instructions on forcible assault.  To prevail on this challenge, Fallen must show that the district court failed to give an instruction that was (1) correct; (2) not substantially covered by other instructions that were given; and (3) "so vital that failure to give the requested instruction seriously impaired the defendant's ability to defend himself." United States v. Gonzalez, 122 F.3d 1383, 1388 (11th Cir. 1997).

The first instruction Fallen proposed contained language from the Eleventh Circuit Pattern Instruction 1.1, pertaining to 18 U.S.C. § 111(a)(1), as well as

13

strategically selected language from United States v. Fernandez, 837 F.2d 1031 (11th Cir. 1988). The proposed instruction utilized Fernandez for the proposition that threats of force, absent any physical contact, are insufficient to constitute a forcible assault. As we established, infra part II.A., the proposed instruction was a misstatement of the law. Accordingly, the district court did not abuse its discretion by refusing to give it.

After the court refused to instruct the jury as Fallen requested, he asked that the court give the Eleventh Circuit Pattern Instruction for forcible assault (Instruction 1.1) in its entirety. The court declined, and instead gave a modified instruction that differed from Instruction 1.1 only in its definition of "forcible assault":

> Now, the term "assault" means a willful attempt to inflict injury upon the person of another, or a threat to inflict injury upon the person of another, which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm.
> Now as stated above, this offense requires proof of forcible assault. Where there is no touching of the victim by the defendant, the force element of this offense may be satisfied only by proof that the defendant engaged in such provocative threats or displays of physical aggression toward the officer as to inspire fear of imminent pain, bodily harm or death.

The district court's definition of forcible assault was a correct statement of the law. We therefore hold that the court's refusal to give Instruction 1.1 in its entirety did not constitute an abuse of discretion.

C.

Assuming the failure of his challenge to the district court's jury charge, Fallen turns to the court's evidentiary rulings; he submits that two of them were erroneous and operated to deny him a fair trial. We review these rulings under the abuse-of-discretion standard. United States v. Fortenberry, 971 F.2d 717, 721 (11th Cir. 1992).

1.

The first ruling Fallen questions concerns the agents' testimony about his previous offenses involving firearms. He objected to the testimony on the ground that it was irrelevant. The court overruled his objection. The court erred, he contends, and because the testimony was highly prejudicial, his conviction should be set aside.

"Generally, evidence of other crimes committed outside of those charged is not admissible. However, other crimes evidence may be admissible if it is inextricably intertwined with the evidence regarding the charged offense." Id. (internal citation omitted). In this case, Fallen's past firearms offenses were relevant to two elements of the forcible assault: Fallen's apparent present ability to inflict imminent bodily harm, and the agents' reasonable apprehension of such

15

harm. The prior offenses, when coupled with Fallen's threats, made it more "apparent" to the agents that Fallen was armed with a gun. The agents testified that their knowledge of Fallen's criminal history reinforced their apprehension that Fallen might shoot them at any moment. Thus, the other crimes evidence was inextricably intertwined with the evidence regarding the charged offense.

Such intrinsic evidence may nevertheless be excluded if its probative value "is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403. Rule 403 is an extraordinary remedy, however, "which should be used only sparingly since it permits the trial court to exclude concededly probative evidence. The balance under the Rule, therefore, should be struck in favor of admissibility. . . . The question implicated by Rule 403 is not whether evidence is prejudicial in and of itself, but whether its probative value 'is substantially outweighed by the danger of unfair prejudice.'" Fortenberry, 971 F.2d at 721 (internal citations omitted).

We do not believe that the prejudicial nature of the other crimes evidence substantially outweighed its probative value. The district court instructed the jury during both agents' testimony that Fallen's prior offenses were to be "considered only on the issue of whether the victims reasonably apprehended immediate bodily harm at the time of the alleged assault." Furthermore, to avoid any association by the jury between making a threat and making a false statement, the court limited

16

the evidence of the 1990 felony conviction for making a false statement in connection with purchasing a firearm; the agents were allowed to testify only that Fallen had a conviction for "a violation that was involved in the purchasing of a firearm." And, although Fallen's offenses were remote in time, their strong probative value in relation to the offense weighed in favor of their admission. Thus, the district court did not abuse its discretion in admitting evidence of Fallen's prior criminal history.

2.

The second evidentiary ruling Fallen questions came when the prosecutor asked Agent Mikosky how many times he had been "shot at" during his law enforcement career. Fallen's lawyer objected, contending that the answer would be irrelevant. The court overruled the objection, and Mikosky replied, "I've been shot at three times, sir." The prosecutor then asked, "[h]ow would you compare the incident at Thomas Fallen's house on October 4th, 1994 with the other times you were shot at?" Defense counsel objected again, and the court replied, "I'm going to sustain the objection. I'll recede from my previous ruling. Disregard the last answer of the witness, ladies and gentlemen." Thus, the jury was instructed not to consider the allegedly improper evidence.

Assuming that the jury should not have heard the prosecutor's questions and Mikosky's responses and that the court's instruction was inadequate to cure the error, we must determine whether the error was harmless. United States v. Hands, 184 F.3d 1322, 1329 (11th Cir. 1999) ("An erroneous evidentiary ruling will result in reversal only if the resulting error was not harmless."). In this case, we are convinced that any error "had no substantial influence on the outcome," Fortenberry, 971 F.2d at 722, in light of the substantial remaining evidence that Mikosky and Fultz's apprehension of serious bodily harm during their encounter with Fallen was reasonable under the circumstances. We thus conclude that any error was harmless because "sufficient evidence uninfected by error supports the verdict." Id.

## IV.

For the foregoing reasons, the judgment of the district court is AFFIRMED.

PROPST, District Judge, dissenting:

The appellant was indicted for and convicted of "forcible assault." I see no evidence that he committed an assault nor that he used force. There was no evidence of any <u>act</u> by the defendant except for the pulling back of a curtain. I respectfully dissent.

When a statute does not define "assault," this court gives the term its meaning at common law. <u>United States v. Williams</u>, 197 F.3d 1091, 1095 (11th Cir. 1999); <u>United States v. Guilbert</u>, 692 F.2d 1340, 1343 (11th Cir.1982). According to <u>Guilbert</u>, "[a]t common law, 'assault' had two meanings, one being a criminal assault, which is an attempt to commit a battery [not present in this <u>Fallen</u> case], and the other being tortious assault, which is an <u>act</u> that puts another in reasonable apprehension of immediate bodily harm." <u>Id.</u> (emphasis added). In <u>United States v. Estrada-Fernandez</u>, 150 F.3d 491, 495 (5th Cir. 1998), the Fifth Circuit referred to an assault which "can be based upon <u>an act</u> that merely places the victim in reasonable apprehension of imminent bodily harm." (quoting <u>Guilbert</u>, 692 F.2d at 1345, (noting difference between 18 U.S.C. §113(d) and §113(c))) (emphasis added). In <u>Ladner v. United States</u>, 358 U.S. 169 (1958), the Supreme Court repeatedly referred to <u>acts</u> of assault and <u>actors</u>. The <u>Ladner</u> Court, referring to the policy of lenity, stated that "[w]hen choice has to be made between

19

two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite. We should not derive criminal outlawry from some ambiguous implication." Id. at 177-78 (quoting United States v. Universal C.I.T. Credit Corp., 344 U.S. 218, 221-22 (1952)). Title 18 U.S.C. §111(a) refers to "acts in violation of this section". The Model Penal Code contains even more restrictive definitions of assaults. See §211-0 et seq. Section 1.13(2) of the Model Penal Code defines "act" as a "bodily movement whether voluntary or involuntary." Black's Law Dictionary defines an "act" as something "done" or "performed." Black's Law Dictionary 24 (5th ed. 1979) (emphasis added).

I have not found any cases in which mere words have been held to constitute an assault. There are few cases that discuss this specific issue, apparently because it has not been often raised. In Dunkleberger v. Commonwealth of Pa. Board of Probation & Parole, the Supreme Court of Pennsylvania held that words alone, no matter how threatening, cannot constitute "assault," because the "actor must be in a position to carry out the threat immediately and must take some affirmative step to do so." 573 A.2d 1173, 1174 (Pa. 1990) (emphasis added).

The Government primarily relies upon United States v. Hernandez, 921 F.2d

1569 (11th Cir. 1991); <u>United States v. Wollenzien</u>, 972 F.2d 890 (8th Cir. 1992); <u>United States v. Street</u>, 66 F.3d 969 (7th Cir. 1995); <u>United States v. Walker</u>, 835 F.2d 983 (2d Cir. 1987); <u>United States v. Fernandez</u>, 837 F.2d 1031 (11th Cir. 1988); and <u>United States v. Renfro</u>, 620 F.2d 497 (5th Cir. 1980). Each is distinguishable, at the very least, on the following bases:

1. <u>Hernandez</u>

Spoke heatedly at close range, poked the agent in a threatening manner. "He got right up against me, nose to nose . . ." and threatened the victim. 921 F.2d at 1576.

2. <u>Wollenzien</u>

The agent was struck in the back of the neck from behind with a severe blow. 972 F.2d at 981.

3. <u>Street</u>

"Street got out of his car and approached the rangers, swinging his fists and shouting obscenities. Street stood face to face with Coe for about fifteen minutes trapping him between the open door and the inside of the truck threatening him . . ." 66 F.2d at 975-976.

4. <u>Walker</u>

The defendant walked into an office; used abusive language; stood over

the victim; threatened him; gestured with his thumb and index finger; removed his jacket; walked within inches of victim while following him from office; and had to be "separated." 835 F.2d at 987-988.

5. Fernandez

Defendant followed the victim, ran after him, and chased him. 837 F.2d at 1032-1033. He then "bumped into him." Id. The defendant's chest touched the victim's arm after a threat. Id. The victim stated that the defendant had pushed him. Id.

6. Renfro

"When they got to their office door, the employees saw Agent Tichenor lying on the floor with defendant Renfro on top of him." 620 F.2d at 499. One witness said Renfro was choking him. Id.

The majority cites United States v. Chestaro, 197 F.3d 600 (2d Cir. 1999). In Chestaro, the defendant removed a box-cutter "from his pocket, [and] he began to swing it at the officers. . . Each officer received a minor injury as a result of the altercation." Id. at 603. Perhaps the closest case cited by the majority in support of the majority conclusion is United States v. Chambers, 195 F.3d 274 (6th Cir.1999). There, however, in full view of the officers, the defendant, who had been told by FBI agents, "FBI, FBI, get down, get down," instead "attempted to place his hand

22

in his right front coat pocket . . . . and, in response [the agents] tackled Chambers and found a loaded 380 caliber Bersa semi-automatic pistol in his right front coat pocket." Id. at 276.  While I do not maintain that there must be proof of physical contact or a view of the weapon,  I do maintain that there must be an act which evinces an assault and force, and not mere words.  There is no question that the officers here could have reasonably concluded that Fallen had a weapon.  That, however, is not the sole issue.  The primary issue is whether he committed a forcible assault.  There is no evidence that he did so unless moving a curtain constitutes a forcible assault.  There is a vast difference between what happened here and what happened in Chambers,  where the defendant had been placed under arrest and told to "get down" but then reached for his pocket where he actually had a firearm.  Id.

In United States v. Crouthers, 669 F.2d 635, cited by the majority, the victim was actually kidnapped and forced to open bank safes.  The defendant participated in the planned robbery.  Again, I do not say that the alleged victims here had to see a firearm.  I only maintain that there had to be evidence of forcible assault, not simply an oral threat or intimidation.

In United States v. Le Compte, another case upon which the majority relies, the defendant "physically attacked Welch with his fists and feet and knocked her

23

down into a ditch where he continued to kick her and threaten her." 108 F.3d 948, (8th Cir. 1997). The court held that the victim could reasonably assume that the defendant might also hit her with a rock which he held while standing over her. Id. at 952.

In United States v.Mathis, 579 F.2d 415, 418 (7th Cir. 1978), also cited by the majority, the defendant pulled out an automatic pistol, took the victim's ignition key and ordered him to give money or he would be killed. Interestingly, the defendant was found guilty of assaulting or interfering with a federal agent without the use of a deadly or dangerous weapon. Id. at 417.

There may be some scattered "kudzu" language[1] in the cases which supports the majority position, but, again, I find no case in which it has been found that mere words stated on the other side of a door with no significant act or deed can constitute an assault of any kind. The defendant could have, perhaps, been found guilty of intimidation, but he was not. The case was submitted only on "forcible assault" and the lesser included offense of simple assault.[2] In Fernandez, the

---

[1] "Kudzu language" is language that persistently spreads into areas not applicable nor contemplated when initially written.

[2] It should be noted that the appellant was not convicted of a misdemeanor simple assault pursuant to 18 U.S.C. §111(a)(2), but of a felony pursuant to the same section. The indictment did not charge "intimidation" even in the alternative. It charged that the defendant "knowingly and willfully did forcibly assault . . . ." The jury was instructed that "the defendant can be found guilty of the offense . . . only if all of the following facts are proven . . . First, that the defendant forcibly assaulted the person . . . ."

24

Eleventh Circuit stated, "The appellant correctly states that 'the concept of the use of force contemplates and requires <u>more than</u> a person <u>merely verbalizing</u> or implying threats involving the future use of force.' . . . . The word 'forcibly means only that <u>some amount of force must be</u> <u>used</u>'" (emphasis added) (citations omitted). <u>Id.</u> at 1035. Other than possibly in dicta, no Eleventh Circuit case has stated to the contrary.

Assault is sometimes defined as "attempted battery." "Menacing" is sometimes referred to an attempted assault. Even "menacing" likely requires some <u>act</u>. I am well aware that an "assault" does not require injury or even touching. However, I do believe that it requires more than words, and that a curtain "twitch" is not sufficient.

Will <u>any</u> person who goes to an unopened door and says to a federal officer, "I have a gun. . . . Get off my porch or I will shoot you," be guilty of forcible assault?[3] An assault is an assault. The fact that the victim is a federal officer only makes it a federal crime. It does not change the nature of an assault. The majority has not cited any case in which an act by the defendant as innocuous as moving a curtain, or some similar act, coupled with mere words, was held to be a forcible

_____

[3]The majority has not discussed what right the officers had to be on the appellant's porch and I have not considered it. The defendant threatened to shoot the officers only if they did not leave his property. There is no evidence that he caused any problem after they did so. While I do not condone such a threat, it is not tantamount to an assault.

assault.

While I will not address the other issues raised by the appellant, I will note that the marginal admission of evidence may well have worked to the appellant's substantial prejudice in, at the very best, a marginal case of forcible assault. The jury found Fallen guilty of forcible assault rather than the lesser included offense of simple assault, which was also submitted to them. The evidence here does not appear to even reach the level of the majority's own definition of misdemeanor "simple assault," which is remarkably similar to the majority's definition of forcible assault, much less to the level of a felony.